STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.

ARUNDEL VALLEY, LLC

Plaintiff

v.                               Docket No. BCD-CV-13-15 ✓

BRANCH RIVER PLASTICS, INC.

Defendant

## ORDER GRANTING RELIEF FROM JUDGMENT

Defendant Branch River Plastics, Inc. has filed a Motion to Vacate Judgment and Plaintiff Arundel Valley, LLC has filed an opposition and a Motion for Sanctions in response. Branch River opposes the Motion for Sanctions. The court elects to decide the pending motions without hearing. *See* M.R. Civ. P. 7(b)(7).

It is undisputed that the Judgment After Remand entered March 20, 2017 in favor of Arundel Valley against Branch River has been satisfied in full. Branch River wants Arundel Valley to execute a satisfaction of judgment, and Arundel Valley refuses to do so in the form Branch River has requested. Accordingly, Branch River has moved to vacate the judgment. The Motion to Vacate is made pursuant to M.R. Civ. P. 60(b)(5), which permits the court to award relief from judgment on the ground that the judgment has been "satisfied, released, or discharged."

Because unsatisfied judgments of record can have adverse financial consequences for the judgment debtor, Branch River's request for a satisfaction of judgment that can be made a matter of record is reasonable. Many judgments are in fact paid by insurers

1

rather than the nominal judgment debtor, and the court sees no need for the satisfaction of judgment to say anything more than that the judgment has been satisfied.

However, the counterpart federal rule to M.R. Civ. P. 60(b)(5) has been interpreted not to permit money judgments to be vacated. "Most courts have agreed that a money judgment does not have prospective application, and that relief from a final money judgment is therefore not available under the equitable leg of Rule 60(b)(5)." *Stokors, S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998). *See also DeWeerth v. Baldinger*, 38 F.3d 1266, 1275 (2d Cir. 1994) ("[I]n practical terms, these standards mean that judgments involving injunctions have 'prospective application,' while money judgments do not").

On the other hand, a judgment debtor who has satisfied a money judgment but has been refused an acknowledgment of satisfaction may be entitled to a different form of relief—a judicial declaration that the money judgment has been paid and satisfied. "Under Rule 60(b), a court may relieve a party from a judgment if "the judgment has been satisfied, released, or discharged . . . ." Fed. R. Civ. P. 60(b)(5). This authority encompasses the power to declare a judgment satisfied . . ." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 579 F.3d 1268, 1273 (11th Cir. 2009), *quoting Gibbs v. Maxwell House, A Div. of Gen. Foods Corp.*, 738 F.2d 1153, 1155 (11th Cir. 1984).

Branch River's motion is clearly captioned as a Motion to Vacate under Rule 60(b)(5), but the court has authority to grant any form of relief available under the rule. Branch River does not need the Judgment After Remand to be vacated in order to

2

obtain the relief it is entitled to. Thus, the relief granted is in the form of a declaration that the Judgment After Remand has been satisfied.

Based on the submissions, the court cannot clearly assign fault for this controversy entirely to one party or the other, and awards no sanctions or costs to either party.

IT IS HEREBY ORDERED AS FOLLOWS:

1. Defendant Branch River's Motion to Vacate is hereby granted in part, to the extent of this Order and otherwise denied.

2. The court hereby declares that the Judgment After Remand docketed in this case March 20, 2017 has been satisfied in full. A separate statement to that effect is issued herein.

3. Plaintiff Arundel Valley's Motion for Sanctions is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated July 7, 2017

_____
A. M. Horton, Justice

3

**STATE OF MAINE**                                 **BUSINESS AND CONSUMER COURT**

Cumberland, ss.

**ARUNDEL VALLEY, LLC**

Plaintiff

v.                        **Docket No. BCD-CV-13-15** ✓

**BRANCH RIVER PLASTICS, INC.**

Defendant

**DECLARATION OF SATISFACTION OF JUDGMENT**

Based on the parties' post-judgment filings, the court hereby declares that the Judgment After Remand docketed herein March 20, 2017 has been satisfied in full.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this declaration by reference in the docket.

Dated July 7, 2017                        _____

A. M. Horton, Justice

# Arundel Valley, LLC v. Branch River Plastics, Inc

## BCD-CV-13-15

### Arundel Valley, LLC
### Plaintiffs

Counsel:                    Timothy Bryant, Esq.
                            One City Center
                            PO Box 9546
                            Portland, ME  04112-9546

### Branch River Plastics, Inc
### Defendant

Counsel:                    Catherine Connors, Esq.
                            Merrills Warf
                            254 Commercial St
                            Portland, ME 04101

STATE OF MAINE                                   BUSINESS AND CONSUMER COURT
Cumberland, ss.

ARUNDEL VALLEY, LLC                    )
                                       )
                Plaintiff              )
                                       )
                                       )               Docket No. BCD-CV-13-15 ✓
        v.                             )
                                       )
BRANCH RIVER PLASTICS, INC.            )
                                       )
                Defendant              )


## RULING AFTER REMAND ON DISCLAIMER OF IMPLIED WARRANTIES

On Defendant Branch River Plastics, Inc.'s appeal of this court's July 13, 2015

Judgment in this case, the Supreme Judicial Court of Maine, sitting as the Law Court, has

vacated the Judgment as to Plaintiff Arundel Valley, LLC's breach of implied warranty claims.

The Law Court has remanded the case for this court to rule on "whether Branch River's

purported disclaimer of implied warranties was effective." *Arundel Valley, LLC v. Branch River*

*Plastics, Inc.*, 2016 ME 175, ¶ 1, 151 A.3d 938.

The Law Court has framed the issue to be addressed on remand as follows:

> If the court rules, based on the evidence presented at trial, that
> Branch River made no legally operative disclaimer of implied
> warranties, the court must re-enter judgment on the jury's verdict
> in Arundel Valley's favor. If, on the other hand, the court rules
> that Branch River did disclaim the implied warranties of
> merchantability and fitness for a particular purpose – by way of
> an express warranty or otherwise – it must enter a judgment in
> Branch River's favor on the two implied warranty counts.

*Id.* ¶ 15, 151 A.3d at ___.

After the Law Court mandate issued, this court established a schedule for the parties to

brief the issue, with Branch River filing initially, Plaintiff Arundel Valley, LLC ["Arundel

Valley"] responding, and Branch River filing a reply. Oral argument was held March 9, 2017,

1

and the record on remand was held open for further filings until March 13, 2017, at which point this court took the matter under advisement.[1]

## A. *Threshold Issues Regarding Scope of Remand*

Through the briefing process, it became apparent that each party is asking this court to decide issues that are beyond the scope of the Law Court's remand.

Arundel Valley asserts that this court should find and conclude that Branch River waived the defense of disclaimer of implied warranties in the course of the trial. *See* Arundel Valley, LLC's Post-Remand Brief at 2-3, *citing* Trial Transcript ("TT") 5:111-12, 5:118.[2] For its part, Branch River asserts that, in addition to the disclaimer of implied warranties issue, this court should decide that what Branch River claims is an independent limitation on damages is enforceable against Arundel Valley. *See* Post-Remand Reply Brief of Defendant Branch River Plastics, Inc. at 17 ("[E]ven if Branch River never disclaimed its implied warranties (which it did) Arundel Valley cannot avoid the consequences of the damages limitation.").[3]

In this court's view, neither Arundel Valley's waiver issue nor Branch River's limitation of damages issue is before this court on remand. As noted above, the Law Court has framed the sole issue on remand as being whether, "based on the evidence at trial," Branch River "did disclaim the implied warranties of merchantability and fitness for a particular purpose– by way of an express warranty or otherwise."

---

[1] Arundel Valley's late filing March 16, 2017 is not considered for purposes of this decision.

[2] This and similar citations are to volumes and pages of the trial transcript. Each volume corresponds to a trial day, so volume 5 covers the fifth trial day.

[3] Branch River's limitation of damages argument is based on a provision in the document that Branch River's president, Robert Mayo, identified as the warranty that applied to Branch River's roof SIPs. *See* Def. Ex. 21; TT 5:30-31.

On its face, the answer to that question lies in the evidence presented at trial. Arundel Valley's contention that Branch River has waived its defense of disclaimer of implied warranties by failing to present evidence is thus outside the scope of the remand.

Similarly, Branch River's argument that this court should consider the effectiveness of the purported limitation on damages is outside the scope of the remand. A contractual limitation on damages is different from a contractual disclaimer of implied warranties and presents different issues of law and fact. The Law Court's remand identifies a single issue for this court to address, which is whether Branch River effectively disclaimed implied warranties.

Accordingly, the court declines to consider either Arundel Valley's waiver argument or Branch River's limitation of damages argument. Instead, the court turns to the issues of fact and law that are encompassed within the ultimate question of whether, based on the evidence at trial, Branch River effectively disclaimed the implied warranties of merchantability and fitness for particular purpose with respect to the structural roof panels it provided to Arundel Valley's project.

B. *Findings and Conclusions Regarding Disclaimer of Implied Warranties*

Based on the entire record, this court hereby adopts the following findings of fact and conclusions of law, which supersede any and all prior statements or rulings on the same matters, however designated.[4] All affirmative findings are based on a preponderance of the evidence unless otherwise indicated.

1. In 2011, Arundel Valley hired a construction company, Peachey Builders, to serve as general contractor and "provide construction administration and management services" and all

---

[4] Branch River's post-remand brief argues that the court has already decided the disclaimer issue in favor of Branch River, based on statements made by the court at trial, after the close of the evidence. *See* Post-Remand Brief of Defendant Branch River Plastics, Inc., at 1-2, 6-7, *citing* TT 6:7-10. To the extent the court's comments constituted rulings, they were explicitly designated as "tentative." TT 6:9. *See* M.R. Civ. 54(b)(1) (decisions, however designated, are subject to revision at any time prior to entry of judgment).

3

"labor, materials, equipment and services necessary" to construct a butter manufacturing facility for Arundel Valley. Plaintiff's Trial Exhibit ("Pl. Ex.") 1; TT 1:171. Arundel Valley owns the facility; Kate's Butter, Inc., formerly a plaintiff in this case, leases the facility from Arundel Valley. TT: 1:166; Pl. Ex. 1. (The construction project is referred to hereinafter as "the Kate's Butter project").

2. During the planning phase for the Kate's Butter project, Peachey Builders and the project architect recommended that the walls and roof of the facility be constructed using structural insulated panels, also known as SIPs. TT 1:176-77. Peachey Builders worked with a third party vendor, House & Sun, to purchase the SIPs. TT 1:179. House & Sun is a company that specializes in the sale of SIPs that it historically has obtained from either of two SIP manufacturers, one of which being Branch River. TT 2:90, 2:93. House & Sun had purchased SIPs from Branch River approximately seventy times in the eight to ten years prior to trial. TT 2:91, 2:94, 2:119.

3. The arrangement was that House & Sun would purchase the wall and roof SIPs from Branch River, and then re-sell them to Peachey Builders through a separate transaction, subject to House & Sun's own pricing. TT 2:134. At the request of Peachey Builders "to price out some [SIPs] on the project," House & Sun reached out to Branch River to prepare a bid for the Kate's Butter project. TT 1:98-99.

4. Branch River is a manufacturer of SIPS for residential and commercial projects. Some of Branch River's SIPS are marketed as Air-Flo SIPS and others are marketed as R-Control SIPs. TT 1:50-54. "Air-Flo" is Branch River's own brand name, but R-Control is a designation that identifies the SIP as "code-compliant," meaning that it is recognized to meet certain standards of manufacturing and performance established and monitored by AFM Corporation ["AFM"], the code compliance service that owns the R-Control designation. TT

4

1:50. The term" code-compliant" as applied to a product means that the product complies with the applicable building code. *See* TT 1:51.

5. R-Control is a registered trademark of AFM. AFM licenses facilities that manufacture SIPs to market products under the R-Control brand. Said licensed facilities must adhere to consistent standards to ensure high quality products. R-Control SIPs are manufactured under carefully controlled conditions and are certified as *per se* code compliant. Branch River has a license to manufacture and sell R-Control products. *See* TT 1:52-54, 3:259-60.

6. Branch River's Air-Flo SIPS are designed and manufactured differently than its R-Control SIPS: the Air-Flo SIPS have channels cut into the foam core, whereas R-Control SIPs have a solid foam core. TT 1:52-54. As a result of the difference, the products perform differently. *Id.* Also, Branch River's Air-Flo SIPs are not certified by any independent service, such as AFM, as being "code-compliant." TT 1:52, 1:55.

7. Branch River proposed to provide R-Control SIPs for the walls of the Kate's Butter facility, and to provide Air-Flo SIPs for the roof of the facility. Pl. Ex. 11, 13. Both proposals contained a critical error—they described the Branch River roof SIPs as R-Control. *Id.* Moreover, the twelve invoices that Branch River submitted to House & Sun for payment of the SIPs also incorrectly identified the Branch River roof SIPs as being R-Control. *See* Pl. Ex. 28.

8. In fact, while Branch River's wall SIPS are indeed R-Control, Branch River's Air-Flo roof SIPS are not R-Control. TT 1:52.

9. Based on Branch River's repeated mischaracterization of its roof SIPS as being R-Control, Kel House, the owner of House & Sun, was under the mistaken understanding that the Branch River roof SIPS were R-Control. *See* TT 2:101, 2:107, 2:112. It was not until June 2012, well after the Branch River SIPS had been installed at the Kate's Butter project, that

5

Branch River told Mr. House that the Branch River roof SIPS were not, in fact, R-Control. Pl. Ex. 37, TT 2:113-14.

10. Based on Mr. House's mistaken understanding, House & Sun submitted a budget estimate to Peachey Builders that mischaracterized the roof SIPS as being R-Control. P. Ex. 15. In December 2011 House & Sun submitted to Peachey Builders Change Order #1 that also mischaracterized the roof SIPS that House & Sun would be supplying as R-Control. Pl. Ex. 36.

11. Based on House & Sun's characterization of the Branch River roof SIPs, Peachey and Arundel Valley were led to believe that the Branch River roof SIPS were R-Control. TT 1:196-97, 2:145-46, -154; *see* Pl. Ex. 20.

12. Pursuant to Peachey Builder's contract with Arundel Valley, Peachey Builders provided its own material warranty to Arundel Valley and was to "assign to [Arundel Valley] all warranties received by Contractor on all materials and equipment included in the Work." Pl. Ex. 1, § 5.5.3.

13. In the course of the dealings in 2011-12 among Branch River, House & Sun, Peachey Builders and Arundel Valley, references were made to the warranty or warranties applicable to Branch River's wall and roof SIPS. The budget estimates that House & Sun provided Peachey Builders for the roof and wall SIPS made reference to "a 20 year factory warranty." Pl. Ex. 12, 18. On November 5, 2011, Branch River's representative provided House & Sun with a formal proposal for the Kate's Butter project that referenced Branch River's "Standard Panel Warranty." Pl. Ex. 21. On December 14, 2011, Peachey Builders sent House & Sun a signed second "Change Order" for the purchase of SIPs, which referenced a "20 year factory warranty." Pl. Ex. 22. On January 17, 2012, Branch River provided its final proposal to sell SIPs to House & Sun, making reference to a "Standard Panel Warranty" for $201,330.00. Pl. Ex. 25.

6

14. Kel House on behalf of House & Sun accepted the Branch River proposal as of January 23, 2012.

15. The Branch River roof SIPS were delivered to the Kate's Butter project site between the end of February and the beginning of April 2012 and were installed by Peachey Builders during the April-June 2012 period. *See* Pl. Ex. 28 (Branch River invoices reflecting shipping dates). During March or April 2012, Branch River's sales manager, Kevin Arcand, visited the site and gave instruction to Peachey Builders on installation of the roof SIPS. TT 16-18.

16. Later in the spring or early summer of 2012, after the roof SIPS had been installed, Mr. Arcand again visited the site and determined that that the installers had not used SIP tape as specified. TT 4:18-19.

17. At that point, in May and June 2012, two major issues arose.

18. One issue had to do with the discovery that Branch River's roof SIPS were not in fact R-Control. As noted above, prior to June 2012, House & Sun, Peachey Builders and Arundel Valley all had been led by Branch River's erroneous descriptions to believe that Branch River's roof SIPS were R-Control. The discovery that the Branch River roof SIPs were not R-Control raised issues about whether the structure would meet building code requirements, and eventually led Arundel Valley to direct that they be removed and replaced.

19. The other issue had to do with the effect of the improper installation of the roof SIPs upon the Branch River warranties that had been mentioned in various proposals and estimates. Mr. Arcand, on behalf of Branch River, advised Kel House that Branch River would not honor its express warranty of the roof SIPS because they had not been installed properly. TT 4:23. Branch River considered the express warranty to have been voided as a result of the improper installation. TT 5:44-45. *See also* Pl. Ex. 56.

7

20. Eventually, Branch River agreed to "reinstate" the express warranty after certain remedial measures were taken to address the installation error. TT 1 at 250-51; Pl. Ex. 57. By that time, Arundel Valley was more concerned with the fact that the roof SIPs were not R-Control and might have to be removed from the building, and it purported to reject Branch River's reinstatement of the warranty.

21. There is no evidence in the trial record that any Branch River warranty document reflected in Defendant's Exhibit 21 was forwarded to House & Sun, Peachey Builders or Arundel Valley until Branch River offered to "reinstate" the express warranty in June or July 2012, well after the Branch River roof SIPS had been purchased, delivered and installed on the Kate's Butter structure. No witness other than Robert Mayo, Branch River's president, was shown Defendant's Exhibit 21. No witness (including Mr. Mayo) testified that Branch River had furnished the warranty document reflected in Defendant's Exhibit 21 to any of the other parties—House & Sun, Peachey Builders or Arundel Valley—until after the problem with the roof SIPS not being R-Control and not properly installed had emerged.

22. The "Limited 20 Year Warranty" document on which Branch River relies is designated as being for the Kate's Butter project and bears signature lines for Kate's Homemade Butter, Peachey Builders and House & Sun, as well as a line for Branch River, but only Mr. Mayo's signature appears on the document. *See* Def. Ex. 21. There is no Branch River warranty document signed by House & Sun, Peachey Builders and/or Arundel Valley in the trial record.

23. The evidence is conflicting on whether the "Limited 20 Year Warranty" marked as Defendant's Exhibit 21 is, in fact, the warranty that was applicable to Branch River's Air-Flo roof SIPS. Robert Mayo, Branch River's president and owner, testified that the "Limited 20

8

Year Warranty" reflected in Defendant's Exhibit 21 applied to all of Branch River's SIPs,[5] but that testimony was contradicted by the testimony of Branch River's sales manager, Kevin Arcand. Mr. Arcand testified that Branch River had a 20-year warranty for its R-Control panels but a different warranty—"probably" a 10-year warranty—for its Air-Flo panels, which were what were installed on the roof of the Kate's Butter structure. TT 4:24. [6] There is no 10-year warranty document in the trial record. Mr. Arcand was not shown Defendant's Exhibit 21.

24. Branch River has a standard warranty for its R-Control SIPS, but no standard warranty for its Air-Flo SIPs. TT 4:36. Thus, the various references to standard warranties in Mr. Arcand's communications with House & Sun appear to apply to the R-Control wall SIPs, but not the Air-Flo roof SIPs.

25. Based on House & Sun's extensive dealings with Branch River, it is possible, and even likely, that House & Sun had seen, at some point, the actual warranty or warranties issued

---

[5] Branch River's president, Robert Mayo, testified as follows:
> Q:    [The] warranty that you offer... Is this the Branch River Warranty?
>       (Defendant's Exhibit 21 identified)
> A:    Yes.
> Q:    And is this the warranty that applies to the Air-Flo panels?
> A:    Air-Flo and any other laminate product that would be produced not under our control.

TT 5:30-31. Mr. Mayo also testified that the Branch River warranty is "a duplicate of the same warranty that's issued by R-Control. It just says Branch River." TT 5:29.

[6] Kevin Arcand, Branch River's sales manager, testified as follows:
> Q:    And what is the standard warranty for an R-Control panel on a commercial job?
> A:    Twenty years on the lamination on the R value.
>       . . .
> Q:    Now tell me about the warranty that came with the Branch River Air-Flo panels; what do you know about that is it also a 20 year warranty?
> A:    No, I would say probably 10 years.
>       . . .
> Q:    Do you at Branch River have standard or standardized warranties?
> A:    Do we have standardized warranties; we do for the R-Control panel.
> Q:    What about the Air-Flo panel?
> A:    No, no.

TT 4:24, 4:36.

9

by Branch River for various projects. But Kel House, the owner of House & Sun, was not shown Defendant's Exhibit 21 and was not questioned about the terms of Branch River warranty for roof SIPs, so the uncertainty created by the discrepancy between Mr. Mayo's testimony and Mr. Arcand's testimony remains unresolved.

26. Moreover, an e-mail message dated June 22, 2012 from Gary Peachey to Daniel Patry of Arundel Valley indicates, "Branch River *will provide* the MFG warranty for your R-Control wall panels and the Branch River Structural airflow [sic] roof panels," *see* Pl. Ex. 36 (emphasis added). This message raises doubt about whether, as of June 2012, Branch River had ever provided the warranty document applicable to the Kate's Butter project to any of the other parties involved in the project. No witness testified that any warranty document *had* been provided previously.

27. What Mr. Mayo identified as the Branch River warranty applicable to the roof SIPS furnished to the Kate's Butter project contains a disclaimer of warranties in all capital letters and bold font, as follows:

> **THE WARRANTY SET FORTH HEREIN IS IN LIEU OF ALL OTHER GUARANTIES AND/OR WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND THIS WARRANTY SHALL NOT BE EXTENDED OR ALTERED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY BRANCH RIVER PLASTICS, INC. AND THE OWNER. THERE ARE NO WARRANTIES AND/OR GUARANTEES WHICH EXTEND BEYOND THE TERMS AND PROVISIONS SET FORTH IN THIS WARRANTY.**

Def. Ex. 21.

28. Based on the absence of evidence that the actual warranty document applicable to the Branch River roof and wall SIPS was provided in the course of the purchase transactions to

either Branch River's purchaser, House & Sun, Inc., or to the subsequent purchasers, Peachey Builders and Arundel Valley, the evidence is insufficient to enable an affirmative finding that, prior to when the Branch River roof SIPS were installed at the Kate's Butter project, House & Sun, Peachey Builders and/or Arundel Valley were made aware of, or were on notice of the disclaimers of implied warranties contained in the Branch River warranty document.

29. Branch River bears the burden of proving by a preponderance of the evidence that it effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose. *Cent. Maine Power Co. v. Foster Wheeler Corp.*, 116 F.R.D. 339, 342 (D. Me. 1987).

30. Implied warranties are created by operation of law but may be disclaimed under Maine law for non-consumer goods. 11 M.R.S. § 2-316. Maine's enactment of the Uniform Commercial Code imposes certain requirements for a valid disclaimer of implied warranties.

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

*Id.*

31. The warranty document reflected in Defendant's Exhibit 21 meets all requirements of 11 M.R.S. § 2-316, including the necessary reference to "merchantability." *Id.* (dictating that it is a sufficient disclaimer to state "There are no warranties which extend beyond the description on the face hereof.").

32. However, the sufficiency of the "Limited' 20 Year Warranty" in Defendant's Exhibit 21 for purposes of section 2-316 does not mean that Branch River's disclaimer of warranties was effective. To be effective, a warranty disclaimer must be part of the bargain between a buyer and seller. *See S.H. Nevers Corp. v. Husky Hydraulics, Inc.*, 408 A.2d 676, 680-81 (Me. 1979)

11

(manufacturer of equipment failed to prove that plaintiff's purchase through dealer was subject to manufacturer's express warranty and disclaimer of implied warranties). *See also American Aerial Servs. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 106 (D. Me. 2014) ("under Maine law, a limitation or disclaimer of warranty is not effective unless it has been received by the buyer subject to those provisions").

33. The parties disagree about whether Maine law requires the manufacturer to prove that the disclaimer was part of the ultimate purchaser's transaction—meaning the transaction between Peachey Builders and Arundel Valley in this case—but the law is clear that Branch River must prove at least that the disclaimer was part of the transaction between it and House & Sun. For the reasons set forth hereinafter, the court finds and concludes that Branch River has failed to meet its burden.

34. As Branch River contends, its voiding of the express warranty in June 2012 affected only the express warranty and did not affect the disclaimer of implied warranty, but that point begs the question as to whether the disclaimer was ever effective. If the warranty, including the disclaimer, was not part of the bargain between Branch River and its immediate purchaser, then the disclaimer was ineffective.

35. For two independent reasons, the court concludes, based on the evidence at trial, that Branch River has failed to meet its burden to prove by a preponderance of the evidence that it effectively disclaimed the implied warranties of merchantability and fitness for particular purpose.

36. First, the evidence is in equipoise as to whether the Limited 20 Year Warranty reflected in Defendant's Exhibit 21—the only written warranty with disclaimer language in the record—is, in fact, the warranty applicable to the Air-Flo roof SIPs. Mr. Mayo said that the Limited 20 Year Warranty is Branch River's standard warranty for all of its SIPs, but Mr.

12

Arcand said that there is no standard warranty for Air-Flo SIPs and that the warranty period for those SIPs is shorter. Moreover, in his communications with House & Sun, Mr. Arcand used terms other than "Limited 20 Year Warranty" to Branch River's warranty, raising unanswered questions as to whether the warranty Mr. Arcand was referring to is the one that Mr. Mayo said is applicable. Because the evidence is in equipoise, the court is unable to make an affirmative finding that Defendant's Exhibit 21—the only warranty document in the evidentiary record—applies to Branch River's roof SIPs.

37. Second, Branch River failed to prove that the "Limited 20 Year Warranty" reflected in Defendant's Exhibit 21 was part of the bargain between it and House & Sun. As noted above, although warranties were referred to by different names in communications between Mr. Arcand and Mr. House, there is no evidence in the record that the Limited 20 Year Warranty reflected in Defendant's Exhibit 21 was provided to House & Sun, not to mention Peachey Builders or Arundel Valley, at any time before the roof SIPs had already been installed on the Kate's Butter structure. Only after the roof SIPS had been purchased, delivered and installed and the issues regarding R-Control and installation had surfaced does the evidence indicate that Branch River provided a warranty document to any other party.

38. Because Branch River tendered the Limited 20 Year Warranty reflected in Defendant's Exhibit 21 only well after all of the purchase transactions had been completed, and after problems had arisen regarding the product, Arundel Valley was not required to accept Branch River's so-called reinstatement of the Limited 20 Year Warranty with its disclaimers.

39. Each of these grounds independently supports the conclusion that Branch River has not met its burden of persuasion on the defense of disclaimer of the implied warranties of merchantability and fitness for particular purpose.

13

## C. *Conclusion*

Defendant Branch River Plastics, Inc. made no legally operative disclaimer of the implied warranties of merchantability and fitness for particular purpose regarding the roof SIPs it sold to House & Sun for the Kate's Butter project. Based on that conclusion, the court is again granting judgment in favor of Plaintiff Arundel Valley, LLC on Counts XI and XII of the Complaint herein. The Law Court having vacated this court's July 13, 2015 Judgment only as to Counts XI and XII of the Complaint, the Judgment After Remand entered herewith addresses only those two counts and the July 13, 2015 Judgment stands as to the other counts of the Complaint.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Ruling on Remand by reference in the docket.

Dated March 20, 2017

_____

A. M. Horton, Justice

**Arundel Valley, LLC v. Branch River Plastics, Inc**

**BCD-CV-13-15**

**Arundel Valley, LLC**
 **Plaintiffs**

      Counsel:                   Timothy Bryant, Esq.
                                      One City Center
                                      PO Box 9546
                                      Portland, ME 04112-9546

**Branch River Plastics, Inc**
 **Defendant**

      Counsel:                   Catherine Connors, Esq.
                                      Merrills Warf
                                      254 Commercial St
                                      Portland, ME 04101

STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


ARUNDEL VALLEY, LLC

Plaintiff

v.                                              Docket No. BCD-CV-13-15 ✓

BRANCH RIVER PLASTICS, INC.

Defendant

## ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL

Defendant Branch River Plastics, Inc.'s Motion for New Trial, together with Plaintiff

Arundel Valley's opposition and Defendant's reply, is before the court. The court elects to

decide the Motion without oral argument. *See* M.R. Civ. P. 7(b)(7).

This Order addresses the Defendant's argument in the order they appear in the Motion.

1. *The Issue of Branch River's Disclaimer of Implied Warranties*

Branch River's first argument is that the court should have granted judgment to Branch

River based on Branch River's disclaimer of the implied warranties of merchantability and

fitness for particular purpose. The evidence at trial included a one-page document purporting

to set forth Branch River's express warranty for its products and a disclaimer of the implied

warranties of merchantability and fitness for particular purpose.

For several reasons, the court disagrees with Branch River's contention.

First, it was clear from the court's summary judgment ruling that Arundel Valley's

implied warranty claims were going to trial. This meant that there were factual issues

regarding: whether Branch River's sale of the roof panels was subject to its purported express

warranty and disclaimer of implied warranties. Arundel Valley denied that it had ever received

Branch River's purported express warranty and disclaimer of implied warranties. This meant

1

that Branch River had the burden to demonstrate that Arundel Valley's purchase of the Branch River roof panels was in fact subject to the express warranty and the disclaimers of implied warranties. *See S.H. Nevers Corp. v. Husky Hydraulics, Inc.*, 408 A.2d 676, 680-81 (Me. 1979) (manufacturer of equipment failed to prove that plaintiff's purchase through dealer was subject to manufacturer's express warranty and disclaimer of implied warranties). *See also American Aerial Servs. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 106 (D. Me. 2014) ("under Maine law, a limitation or disclaimer of warranty is not effective unless it has been received by the buyer subject to those provisions"). Thus, whether Branch River's disclaimer of implied warranties was valid as to Arundel Valley was, at least in part, a question of fact. The jury could have been duly instructed on the issue, but Branch River did not request any such instructions.

Next, the evidence indicated that Branch River, in the sales documents it issued to House & Son as well as in e-mails to House & Son, described the roof panels as being R-Control, which admittedly they were not. Branch River's mischaracterization of its own product generated another issue as to the validity of its purported disclaimer of the implied warranty of merchantability—does a manufacturer's disclaimer of the implied warranty of merchantability extend to a product sold as something it is not?

Third, the evidence also indicated that Branch River claimed to have "voided" its warranty, and then requested Arundel Valley, Peachey Builders and House & Sun to sign a document "accepting" both the express warranty *and the disclaimer of implied warranties*. Branch River's Motion correctly points out that its voiding of the express warranty did not necessarily void the disclaimer of implied warranties as well. However, Branch River fails to acknowledge that its request for Arundel Valley to "accept" the disclaimer of implied warranties along with the express warranty raises issues regarding the status of the disclaimer of warranty. Did Branch River "void" the disclaimer of implied warranties along with the express

2

warranty? If not, why was Branch River asking Arundel Valley to "accept" the disclaimer along with the express warranty? The jury could have been instructed to consider these issues, but no such instructions were requested.

Each and every one of these three areas of evidence generated potential jury issues, and the jury could have been instructed in detail. The jury was indeed instructed regarding the law relating to implied warranties, but Branch River requested no jury instructions whatever on disclaimer of warranty issues.

The evidence was sufficient to support a finding against Branch River on the disclaimer of implied warranty issue, on three different grounds. The jury could have decided that Branch River failed to establish that Arundel Valley was on notice of the disclaimer, or that Branch River's mistaken designation of the roof panels as R-Control established an independent implied warranty of merchantability and/or fitness for particular purpose, or that Branch River rescinded ("voided") the disclaimer and Arundel Valley never agreed to Branch River's offer to reinstate it.

Therefore, Branch River was not entitled to judgment on the validity of its purported disclaimer of implied warranties, and its failure to request jury instructions to guide the jury's decision on whether Arundel Valley's purchase of the roof panels was subject to the disclaimer does not justify overturning the verdict.

2. *Testimony of James DiStefano*

Branch River's second ground for requesting a new trial is its claim to have been "ambush[ed]" by the trial testimony of James DiStefano, an expert witness for Plaintiff—specifically his testimony that he had noted gaps between the pieces of Expanded PolyStyrene (EPS) foam inside the Branch River roof panels. The court does not view the testimony at issue to be grounds for a new trial.

3

First, Branch River did not object to the testimony. Whether the failure to object was calculated or inadvertent, the "horse was not [entirely] out of the barn," as Branch River claims, *see* Defendant's Motion for New Trial at 10 n.14—there are several steps that the court could have taken to cure any problem.

However, no curative steps likely were in order: as Arundel Valley's Response in Opposition to the Branch River Motion elucidates in detail, Branch River was on notice of the substance of the testimony at issue. The supposedly new opinions and observations to which Branch River objects had been substantially disclosed. As Arundel Valley points out, the trial testimony that Branch River now objects to was, in substance, summarized in a July 2013 letter from Mr. DiStefano that Arundel Valley attached to a motion in limine filed well before trial. In fact, Branch River's Motion acknowledges that the testimony at issue—about Mr. DiStefano's third site visit—was so similar to his report of his second site visit that Branch River's counsel mixed the two up. *See id.* at 10 n.14.

Thus, Branch River has not shown that Mr. DiStefano's trial testimony furnishes grounds for a new trial.

### 3. The Expert Witness Reports of Messrs. DiStefano and Foard

Branch River"s next argument is that the court erred in sustaining Arundel Valley's objection to Branch River's motion to admit the written reports of two of Arundel's expert witnesses, James DiStefano and Bo Foard. The reports were used in cross-examining the witnesses, but the reports themselves were excluded as inadmissible hearsay. *See Malenko v. Handrahan*, 2009 ME 96, ¶ 35, 979 A.2d 1269, 1276. In theory, it could have been argued that the reports were admissible as party admissions, *see* M.R. Civ. P. 801(d) but the argument was not made, and even had it been, their admissibility is doubtful.

4

Moreover, Branch River was allowed to, and did, use the report extensively in cross-examining Messrs. DiStefano and Foard. Anything in the reports could have been read to the witnesses. Even assuming the reports should have been admitted, Branch River has not demonstrated any prejudice from the court's decision to exclude the reports.

### 4. *Testimony of Paul Malko*

Branch River moved in limine to exclude the testimony of Paul Malko, and now asks the court to reconsider its denial of that motion and grant a new trial. Mr. Malko's testimony about Branch River's process was relevant and admissible, as the court ruled previously.

### 5. *Jury Confusion Regarding Causation*

Here Branch River appears to raise, for the first time, an objection to the court's instruction regarding causation and the court's response to a note from the jury regarding how the jury should consider "installation errors." The court's response indicated that the jury could consider the effect of installation errors in determining whether Arundel Valley had proved that any breach of implied warranty by Branch River was the proximate cause of the losses claimed by Arundel Valley. As Branch River points out, the jury soon after returned a verdict in Arundel Valley's favor. Branch River attributes the result to jury confusion, but an equally plausible explanation—one that is consistent with the verdict—is that the jury decided that Branch River's breach, not any installation error, was what made it necessary for the roof to be removed and replaced.

### 6. *Breach of Warranty of Fitness for Particular Purpose*

Branch River argues that the evidence was insufficient to support the verdict finding it liable for breach of warranty of fitness for particular purpose. Again, the court disagrees. The particular purpose Arundel Valley advanced at trial was that it wanted R-Control SIPS for its roof panels. Perhaps the clearest evidence that Branch River knew of this purpose is that the

5

price quote and invoices it issued for the roof panels to be installed at Arundel Valley's new facility described the panels, incorrectly, as R-Control. Branch River filed a motion in limine to exclude the price quote and invoices, but the court denied the motion because they are directly relevant to both of Arundel Valley's breach of implied warranty claims.

A separate reason why Branch River is not entitled to a new trial based on the verdict for breach of implied warranty for particular purpose is that the jury also found Branch River liable on the independent claim of breach of implied warranty of merchantability.

7. *Damages*

Lastly, Branch River challenges the sufficiency of the evidence to support the entire damages award to Arundel Valley. It is quite true that Arundel Valley's evidence regarding damages was thin, at least as to some items claimed as damages. On the other hand, there was testimony, mainly from Daniel Patry but from other Plaintiff's witnesses also, sufficient to support the verdict in terms of both causal connection and dollar amount.

Moreover, Branch River made many of the same arguments to the jury that it makes now in its Motion for New Trial. Clearly, substantial issues as to mitigation of damages and avoidable costs were generated and pursued at trial, and Branch River also argued to the jury that Arundel Valley was trying to get an "upgrade" at Branch River's expense. Certainly the evidence did not compel the jury to make the damages award that it did, but the question at hand is whether the evidence was sufficient to support the award. Viewing the totality of the evidence in a light favorable to the verdict, the court concludes that the evidence was sufficient.

For the foregoing reasons, Defendant's Motion for New Trial is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated September 10, 2015

_____
A. M. Horton, Justice

**Arundel Valley, LLC and Kate's Homemade Butter, Inc., Daniel J. Patry and Karen I. Patry v. Peachey Builders, Inc.; Gary R. Peachey; Kevin Brown Architecture, LLC; Kevin Brown; Branch River Plastics, Inc.; Robert Mayo; House & Sun, Inc., and Kel House**

**BCD-CV-13-15**

**Arundel Valley, LLC and Kate's Homemade Butter, Inc.**
**Daniel J. Patry and Karen I. Patry**
**Plaintiffs / 3rd Party Plaintiffs**

Counsel:                          Timothy Bryant, Esq.
                                  One City Center
                                  PO Box 9546
                                  Portland, ME 04112-9546

**Branch River Plastics, Inc. and Robert Mayo**
**Defendant**

Counsel:                          Martica Douglas, Esq.
                                  103 Exchange St.
                                  PO Box 7108
                                  Portland, ME 04112-7108

STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


ARUNDEL VALLEY, LLC

                        Plaintiff

            v.                              Docket No. BCD-CV-13-15

BRANCH RIVER PLASTICS, INC.

                        Defendant

                ORDER ON COSTS, INTEREST AND EXPENSES

Plaintiff and Defendant Robert Mayo have both submitted bills of costs. Plaintiff's request for full prejudgment interest is before the court, along with Defendant Branch River's request for a full or partial waiver of prejudgment interest. Also, Defendant Branch River has filed a motion for expenses for failure to admit under M.R. Civ. P. 37(c). The court elects to decide all of these without hearing, *see* M.R. Civ. P. 7(b)(7).

*Prejudgment Interest*

Defendant Branch River's request for a full or partial waiver of prejudgment interest is granted in part. The fact that Plaintiff Arundel Valley sued multiple parties doubtless prolonged the case, and as Branch River says, other defendants did obtain extensions of the schedule, albeit without objection by Branch River. Plaintiff's motion for reconsideration deferred a final ruling on Branch River's motion for summary judgment, although only for about two months. Branch River's other arguments for a waiver are unpersuasive. For example, it is not sufficiently clear that any delay by Arundel Valley in providing discovery materially delayed resolution of the case. Second, Branch River's claim that Arundel Valley refused to mediate is contested, and in any case, the claim should have been brought up at the time.

1

Branch River has shown good cause for a partial waiver of prejudgment interest. Plaintiff is hereby awarded prejudgment interest for 748 days at $56.42 per day, for a total of $42,202.16.

*Plaintiff's Costs*

From Plaintiff's bill of costs, the court awards the following:

$755.24 in recoverable costs under section 1502-B of title 14, M.R.S.

$1,138.60 for James DiStefano's time and mileage

$593 for the Rick Dauphinais deposition

$1172 for the John Vargas and Lisa Murphy depositions

$1,483 for the Kevin Arcand deposition

$460.20 for the deposition of Daniel Patry

$500 for preparation and copying of trial exhibits

*Defendant Mayo's Costs*

Defendant Mayo seeks reimbursement for a motion to dismiss that was later withdrawn. Although Mr. Mayo did prevail on summary judgment, in the court's view, he would not have prevailed on a Rule 12(b)(6) motion to dismiss. Moreover, the withdrawal of the motion means he cannot be deemed to have prevailed as to that issue. His request for costs is denied.

*Defendant Branch River's Motion for Expenses*

Branch River seeks reimbursement for the expense of proving the validity of certain tests conducted by Craig Barnes, P.E. on Branch River's panels. Mr. Barnes's test results were cited by Arundel Valley's expert and came into evidence through an exhibit, not through Mr. Barnes's testimony. However, nothing about the jury verdict indicates that the proposition

2

Branch River claims was proved was in fact proved. The verdict indicates that the jury considered Mr. Barnes's test results either not proven or irrelevant—more likely the latter.

Defendant Branch River's Rule 37(c) Motion for Fees and Expenses is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated September 10, 2015      __/S_____

                                                 A. M. Horton, Justice

**Arundel Valley, LLC and Kate's Homemade Butter, Inc., Daniel J. Patry and Karen I. Patry v. Peachey Builders, Inc.; Gary R. Peachey; Kevin Brown Architecture, LLC; Kevin Brown; Branch River Plastics, Inc.; Robert Mayo; House & Sun, Inc., and Kel House**

**BCD-CV-13-15**

**Arundel Valley, LLC and Kate's Homemade Butter, Inc.**
**Daniel J. Patry and Karen I. Patry**
    **Plaintiffs / 3rd Party Plaintiffs**

      Counsel:               Timothy Bryant, Esq.
                            One City Center
                            PO Box 9546
                            Portland, ME 04112-9546

**Branch River Plastics, Inc. and Robert Mayo**
    **Defendant**

      Counsel:               Martica Douglas, Esq.
                            103 Exchange St.
                            PO Box 7108
                            Portland, ME 04112-7108

STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


ARUNDEL VALLEY, LLC

Plaintiff

v.                                            Docket No. BCD-CV-13-15

BRANCH RIVER PLASTICS, INC.

Defendants

ORDER ON MOTIONS IN LIMINE

The remaining parties, Plaintiff Arundel Valley, LLC and Defendant Branch River

Plastics, Inc. have filed a total of eight motions in limine in anticipation of trial. This Order

addresses all such motions beginning with Plaintiff's unopposed motions in limine and

continuing with Plaintiff's opposed motions and then Defendant's motions. The court elects to

decide the motions without oral argument.

1. **Plaintiff's Motion In Limine To Exclude Testimony Of Larry Turner:** The

Plaintiff's Motion seeks to exclude any testimony by Larry Turner, who at one point was

identified as possible defense witness. The court has previously ruled that any testimony by

Mr. Turner would be limited to non-expert testimony, and the Plaintiff's motion seeks to

exclude him as a fact witness as well. No opposition to the motion was filed. Without

objection, Plaintiff's Motion In Limine To Exclude Testimony Of Larry Turner is granted: It

is ORDERED that Larry Turner is excluded as a witness.

2. **Plaintiff's Motion In Limine To Exclude Evidence Of Comparative Fault:** This

Motion seeks to preclude the Defendant from presenting any evidence for the purpose of

demonstrating comparative negligence on the part of Plaintiff, *see* 14 M.R.S. § 156. Given that

there are no negligence or tort claims remaining in this case, as a result of the court's prior

1

summary judgment ruling, the Motion is appropriate, and perhaps for that reason, was unopposed. The Plaintiff's Motion In Limine To Exclude Evidence Of Comparative Fault is granted. It is ORDERED that evidence relevant solely to comparative negligence is excluded. This ruling does not, in and of itself, bar evidence relevant to other defenses, including failure to mitigate damages, nor does it preclude Defendant from challenging the necessity or reasonableness of the steps taken by Plaintiff to address the circumstances that underlie the claims that are going to trial.

3. **Plaintiff's Motion in Limine to Exclude Evidence and Apportioning of the Settling Defendants' Fault**: This Motion, which is also unopposed, seeks to exclude any evidence of fault on the part of the Defendants who have settled the Plaintiffs' claims against them, and to preclude any apportionment of fault by the jury, on the ground that Branch River has elected to have the amount obtained in settlement from the settling Defendants deducted from any award against this Defendant. *See* 14 M.R.S. § 163. Given that the Motion is unopposed, the court infers that the Defendant concurs, and therefore grants the Motion. It is ORDERED: Branch River Plastics, Inc. may not enter evidence whose sole relevance is to prove that the settling Defendants were at fault in this matter; and the court will not instruct the jury to apportion Plaintiff's damages among Defendant Branch River and the settling Defendants.

4. **Plaintiff's Motion in Limine to Exclude Testimony of Craig E. Barnes:** This Motion, which is opposed, seeks to preclude Defendant from calling Craig E. Barnes as a witness. Mr. Barnes is a professional engineer who participated in testing Branch River structural insulated panels (SIPs) in the course of the investigation of the Plaintiff's claims that Branch River's SIPs failed to comply with Plaintiff's specifications. The court has already ruled that Mr. Barnes will not be permitted to present any expert testimony. *See* Order On

2

Plaintiffs' Motion In Limine To Exclude Testimony Of Craig Barnes, P.E. And Larry Turner (Nov. 14, 2014).

Defendant's opposition to the Plaintiff's Motion maintains that Mr. Barnes should still be considered a fact witness only, not an expert, regarding the testing.

A fact witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. M.R. Evid. 701. The witness's testimony must be "adequately grounded on personal knowledge or observation." *Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales, Inc.*, 1998 ME 53, ¶ 21, 707 A.2d 1311 (quoting Field & Murray, Maine Evidence 701.1 (4th ed. 1997)). "[O]pinion testimony that . . . is not within the common knowledge of an ordinary person . . . may not be given by a lay witness." *State v. Marden*, 673 A.2d 1304, 1311 n.5 (Me. 1996); *accord Chrysler Credit*, 1998 ME 53 at ¶ 22, 707 A.2d at 1317 (holding that opinion that was "derived from . . . specialized knowledge . . . and was not within the realm of the ordinary layperson"). Further, when opinion is derived from . . .specialized knowledge . . . [it is] not within the realm of the ordinary layperson. *Id.*

In this case, Mr. Barnes' testimony must be limited to his personal knowledge of facts relevant to this case, and any testimony he gives, whether or not in the form of an opinion, cannot be based on scientific, technical, or other specialized knowledge. This may limit his admissible testimony drastically, but the court is not prepared to decide that Mr. Barnes has no admissible testimony at all to offer as a fact witness.

Therefore, the ruling is essentially that Mr. Barnes's status remains as it was determined to be in the November 14, 2014 Order mentioned above. It is ORDERED: Plaintiff's Motion in Limine to Exclude Testimony of Craig E. Barnes is granted to the extent

3

that Craig E. Barnes will not be permitted to testify as an expert witness, and is denied as to any testimony as a fact witness.

5. **Plaintiff's Motion In Limine To Exclude Evidence That Arundel Valley Failed To Mitigate Damages:** This Motion, which is also opposed, seeks to preclude Defendant from offering or eliciting any evidence that Plaintiff failed to mitigate its damages. The basis for the Motion is that Defendant Branch River has not designated any expert witness to contradict the Plaintiff's expert evidence that Plaintiff had to take the steps it did in response to the circumstances underlying Plaintiff's claims.

In Maine, a party who sustains any loss for which another may be liable has a duty to mitigate damages. *See Schiavi Mobile Homes, Inc. v. Gironda*, 463 A.2d 722, 724 (Me. 1983); *see also Lindsey v. Mitchell*, 544 A.2d 1298 (Me. 1988). In other words, the law requires the injured party to "use ordinary care and take all reasonable measures within his knowledge and power to avoid the loss and render the consequences as light as may be; and it will not permit him to recover for such losses as by such care and means might have been prevented." *Schiavi Mobile Homes*, 463 A.2d at 724 (citing *Grindle v. E. Express Co.*, 67 Me. 317, 325 (1877)). "The touchstone of the duty to mitigate is reasonableness. The nonbreaching party need only take reasonable steps to minimize his losses; he is not required to unreasonably expose himself to risk, humiliation or expense." *Id.* at 724-25.

Plaintiff contends its decision to remove the roof relied on the scientific, technical, and specialized knowledge of its experts. Plaintiff argues that the Defendant, who has not designated an expert as to the mitigation issue, may not use lay testimony to prove its mitigation defense.

There is no bright-line rule that requires the affirmative defense of failure to mitigate to be supported by expert evidence, although "[a] party presenting a failure to mitigate damages

4

defense without expert testimony on causation will do so at his or her own peril." *Willis v. Westerfield,* 839 N.E.2d 1179, 1189 (Ind. 2006).

In the court's view, even if Branch River acts at its peril by not presenting expert evidence to counter the Plaintiff's expert evidence, the Plaintiff's Motion rests on two incorrect premises—that the only admissible evidence of failure to mitigate would consist of expert testimony, and that the jury will be compelled to believe Plaintiff's experts. The first premise is incorrect because, for example, evidence that the Plaintiff removed the Branch River panels on its own initiative, without any order directing it to do so, clearly could be taken to show failure to mitigate damages, without any need at all for expert evidence. As to the second premise, whether or not the Defendant presents expert evidence, Defendant will be permitted to cross-examine any of Plaintiff's experts on mitigation issues, and this court cannot assume, before trial, that the jury will credit any expert witness's testimony. It is ORDERED: Plaintiff's Motion In Limine To Exclude Evidence That Arundel Valley Failed To Mitigate Damages is denied.

6. **Plaintiff's Motion In Limine To Bar Statement That The SIPs Were Not Defective:** This Motion, which is also opposed, seeks an order barring Defendant's counsel from making any statement or argument to the effective that the SIPs manufactured by Defendant and installed at the Plaintiff's facility were not defective. The stated ground for the Motion is that the Plaintiff has developed "ample record evidence," mainly in the form of opinions from its designated expert witnesses, that the SIPs furnished by Branch River were defective in various respects. The flaw in this reasoning is that it assumes the credibility and weight that the jury will assign to that evidence. Thus, in effect, the Motion asks that the Defendant not be allowed to argue that the jury should reject the Plaintiff's evidence that the Branch River SIPS were defective, or that the Plaintiff has failed to prove any defect. As

5

Defendant's opposition notes, there is simply no basis for the limitation that the Plaintiff seeks to impose. Counsel's argument cannot mischaracterize the evidence, but it certainly can suggest that the opposing party's evidence be discounted or rejected. It is ORDERED: Plaintiff's Motion In Limine To Bar Statement That The SIPs Were Not Defective is denied.

7. **Defendant's Motion In Limine To Exclude Testimony of Paul Malko:** This Motion, which is opposed, seeks to exclude any testimony by Paul Malko, whom Plaintiff has designated as an expert witness on Defendant's manufacturing process. Defendant's Motion rests on two grounds: first, that Mr. Malko is not qualified, and second, that his proposed expert testimony is not relevant.to the warranty claims that remain in this case. Defendant further notes that Mr. Malko is or was employed by a competitor of Defendant, presumably to suggest bias. Plaintiff responds to the Defendant's qualification objection by asserting that Mr. Malko is an engineer with expertise and experience in the manufacture of SIPS. Plaintiff responds to the relevance objection by asserting that the process by which Defendant's SIPs are manufactured is relevant to the issue of whether Defendant is in breach of warranty as alleged in the remaining claims. The court agrees with Plaintiff on both points—assuming the witness has the background that Plaintiff says he does, the issue becomes one of weight rather than admissibility. Moreover, the process by which a product is manufactured can be relevant to whether the product is as warranted. This does not mean that any and all testimony by Mr. Malko will be allowed, but only that the court is not prepared to exclude the testimony on an in limine basis. It is ORDERED: Defendant's Motion In Limine To Exclude Testimony of Paul Malko is denied.

8. **Defendant's Motion In Limine Re: Branch River Price Quote and Invoices:** This Motion, which is opposed, seeks to exclude any evidence of a price quote submitted by Defendant to a former Defendant, House & Sun, for the SIPs furnished by Defendant to

Plaintiff's project, as well as Defendant's invoices for those SIPs. The price quote and the invoices described the SIPs sold by Defendant as "R-Control."

The stated basis for the Motion is that the documents in question are not relevant to either of the remaining claims for breach of implied warranty of merchantability and breach of implied warranty of fitness for particular purpose. Defendant's reply to Plaintiff's opposition correctly notes that there is no express warranty claim in this case, and goes on to argue that there is no issue of reliance by Plaintiff.

But the court sees the price quote and invoices as being relevant to indicating exactly what the Defendant was selling, because exactly what a product purports to be is relevant to what implied warranties attach to the product, regardless of whether any express warranty is made.

The implied warranty of merchantability is implicit in a contract for the sale of goods. 11 M.R.S § 2-314 (2014). The seller warrants that the goods offered for sale are "fit for the ordinary purposes for which such [goods] are purchased." *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195 (Me. 1990) (citations omitted). The comments to the implied warranty of merchantability statute indicate:

> Goods delivered under an agreement made by a merchant in a given line of trade must be of a quality comparable to that generally acceptable in that line of trade under the description or other designation of the goods used in the agreement. The responsibility imposed rests on any merchant-seller.

11 M.R.S. § 2-314 cmt. 2.

The implied warranty of fitness for a particular purpose is narrower than the implied warranty of merchantability. It requires that:

> (1) the purchaser have a particular purpose outside the scope of ordinary purposes; (2) the seller at the time of contracting has reason to know of the particular purpose; (3) the seller has reason to know that the purchaser is relying on the seller's skill or judgment to furnish appropriate goods; and (4) the purchaser must, in fact, rely upon the seller's skill or judgment.

7

*Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me. 1990).

The price quote and invoices that Defendant seeks to exclude are relevant to both of the Plaintiff's warranty claims. Plaintiff offers the contested documents into evidence to demonstrate not only that it had an expectation that R-Control Air-Flo SIPs would be delivered, but that the Defendant agreed to deliver—and purported to deliver—R-Control Air-Flo SIPs to Plaintiff's project. Plaintiff contends that the products that were ultimately delivered, however, were not merchantable as R-Control Air-Flo SIPs and also were not fit for Plaintiff's particular purpose. The price quote and invoices indicating that R-Control SIPs would be provided and were provided are thus relevant to whether the Defendant breached the implied warranties of merchantability and fitness for particular purpose.

Of course, the Defendant remains free to argue that the R-Control designation has no bearing on the performance of a SIP for purposes of either the implied warranty of merchantability or the implied warranty of fitness for particular purpose, and that, too, is an issue in the case. But the question at hand is one of relevance, and under the broad standard of relevance reflected in M.R. Evid. 401-02, the quote and invoices are relevant and admissible. It is ORDERED: Defendant's Motion In Limine Re: Branch River Price Quote and Invoices is denied.

Pursuant to M.R. Civ. P. 79(a), the clerk is directed to incorporate this Order by reference in the docket.

Dated June 3, 2015

_____
A. M. Horton, Justice

Entered on the Docket: 6-3-15
Copies sent via Mail ___ Electronically ✓

8

**Arundel Valley, LLC and Kate's Homemade Butter, Inc., Daniel J. Patry and Karen I. Patry v. Peachey Builders, Inc.; Gary R. Peachey; Kevin Brown Architecture, LLC; Kevin Brown; Branch River Plastics, Inc.; Robert Mayo; House & Sun, Inc., and Kel House**

**BCD-CV-13-15**

**Arundel Valley, LLC and Kate's Homemade Butter, Inc.**
**Daniel J. Patry and Karen I. Patry**
**Plaintiffs / 3rd Party Plaintiffs**

       Counsel:                    Timothy Bryant, Esq.
                                      One City Center
                                      PO Box 9546
                                      Portland, ME  04112-9546

**Branch River Plastics, Inc. and Robert Mayo**
**Defendant**

       Counsel:                    Martica Douglas, Esq.
                                      103 Exchange St.
                                      PO Box 7108
                                      Portland, ME 04112-7108

STATE OF MAINE                           BUSINESS AND CONSUMER COURT

Cumberland, ss.                          Location: Portland
                                         Docket No.: BCD-CV-13-15          ✓


ARUNDEL VALLEY, LLC et al.,        )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )
                                   )    ORDER ON DEFENDANTS' MOTION
BRANCH RIVER PLASTICS, INC., et    )        FOR SUMMARY JUDGMENT
al.,                               )
                                   )
                Defendants.        )


## I. INTRODUCTION

Defendants Branch River Plastics, Inc., ["Branch River"] and Robert Mayo

[collectively "Defendants"] move for summary judgment with respect to all counts asserted

against them by Plaintiffs Arundel Valley, LLC ["Arundel"] and Kate's Butter, Inc. ["Kate's"].

The Complaint alleges that Branch River is liable—and Mr. Mayo is personally liable—to

Plaintiffs for damages arising out of roof panels supplied by Branch River to Arundel's butter

making facility [the "Facility"] during construction.

## II. MATERIAL FACTS

The following facts are undisputed, except where noted:

Arundel owns a butter-making facility in Arundel, Maine. (Supp. S.M.F. ¶ 1; Opp.

S.M.F. ¶ 1.) Kate's leases the premises from Arundel and runs a butter manufacturing

operation.[1] Both companies are owned and operated by Dan and Karen Patry. (Supp. S.M.F. ¶

3; Opp. S.M.F. ¶ 3.) Dan Patry has authority to make decisions on behalf of Arundel with

---

[1] Kate's was started by the Patrys in the basement of their Old Orchard Beach home. The Patrys sought
to expand their home business into the technologically advanced Facility. (Pls.' Opp. Mot. 1-2.)

1

respect to the design and construction of the Facility. (Supp. S.M.F. ¶ 4; Opp. S.M.F. ¶ 4.) In preparation for the construction process, the Patrys hired a team of professionals—including architect Kevin Browne ("Browne"), general contractor Peachey Builders, and other design professionals. (Defs.' Addt'l S.M.F. ¶ 3; Opp. Defs.' Addt'l S.M.F. ¶ 3.) Mr. Patry intended to construct an energy efficient facility by utilizing Structural Insulated Panels ("SIPs").[2] (Supp. S.M.F. ¶ 11; Opp. S.M.F. ¶ 11.); (Defs.' Addt'l S.M.F. ¶ 4.)

Branch River, manufactures "expanded polystyrene building and packing products," including SIPs (Supp. S.M.F. ¶¶ 6-7; Opp. S.M.F. ¶¶ 6-7.) In September 2011, Arundel entered into a contract with Peachey Builders to construct the foundation and exterior shell of the Facility. (Supp. S.M.F. ¶ 9; Opp. S.M.F. ¶ 9.) Under the terms of the contract, the roof and the walls of the Facility were to be constructed with SIPs. (Supp. S.M.F. ¶ 10.) Mr. Patry made clear his intention to utilize SIPs in the construction and gave Peachey Builders the responsibility of procuring appropriate materials.[3] (Supp. S.M.F. ¶ 13; Opp. S.M.F. ¶ 13.) Peachey Builders contacted House & Sun, a distributor of solar and green building materials located in Brooksville, Maine, to obtain an estimate on the SIPs required for the construction of the Facility. (Supp. S.M.F. ¶ 14.) Peachey Builders gave House & Sun preliminary drawings prepared by architect Browne. (Supp. S.M.F. ¶ 16.) Thereafter, House & Sun hired Branch River to prepare drawings depicting a configuration of roof and wall SIPs.[4]

---

[2] SIPs consist of two pieces of oriented strand board with a core of "expanded polystyrene foam in between." (Defs. Addt'l S.M.F. ¶ 6.) SIPs prevent a "hot roof" and help to prevent ice damming, accumulation of condensation, and shortening of the lifespan of shingles. (Pls.' Compl. ¶ 35.)

[3] The contract allowed Arundel to "sign off" on the products procured. (Opp. S.M.F. ¶ 13.)

[4] Arundel denies that any drawings were ever prepared. (Opp. S.M.F. ¶ 17.)

At the time, Branch River's website is alleged to have indicated that it was licensed to manufacture R-Control Products from AFM Corporation.[5] (Pls.' Opp. Mot. 3.) Further, according to Arundel, Kevin Arcand, an employee of Branch River, indicated to House & Sun that the SIPs provided would be licensed R-Control products. (Pls.' Opp. Mot. 2.) Branch River, however, points out that the initial drawings prepared for the project indicated that the roof would be comprised of vented SIPs and was labeled "Air-Flo" SIPs, not R-Control Air-Flo SIPs. Architect Browne reviewed and approved said drawings for general conformance with the design concept of the project. (Supp. S.M.F. ¶ 18; Opp. S.M.F. ¶ 18.)

On January 17, 2012, Branch River submitted a proposal or estimate[6] to House & Sun for the sale of the SIPs to be used in the project. (Supp. S.M.F. ¶ 19; Opp. S.M.F. ¶ 19.) Branch River's proposal or estimate did not indicate that Branch River's SIPs would be R-Control. On January 23, 2012, Kel House, of House & Sun, accepted Branch River's proposal or estimate. (Supp. S.M.F. ¶ 20; Opp. S.M.F. ¶ 20.) Under the Terms & Conditions, Branch River indicated the materials were subject to a "Standard Panel Warranty."[7] (Supp. S.M.F. ¶ 21; Opp. S.M.F. ¶ 21.) Thereafter, the Panels were delivered directly to the Facility jobsite.[8] Branch River provided instruction to the crew that installed the panels and Branch River's

---

[5] R-Control is a registered trademark of AFM Corporation. AFM makes its products available to licensed facilities. Said licensed facilities must adhere to consistent standards to ensure high quality products. (Pls.' Compl. ¶ 34.) R-Control SIPs are manufactured under carefully controlled conditions and are recognized as *per se* code compliant. They are designed to block wind and moisture for high-energy efficiency. Branch River has a license to manufacture R-Control products. (Defs.' Addt'l S.M.F. ¶¶ 10-13.)

[6] The parties disagree as to whether there this was a proposal or an estimate.

[7] The Plaintiffs never received a copy of the Standard Panel Warranty until after dispute arose between the parties. (Defs.' Addt'l S.M.F. ¶ 31; Opp. Defs.' Addt'l S.M.F ¶ 31.)

[8] Branch River contends that it never received notice of any problems with the delivered SIPs upon delivery or installation. (Supp. S.M.F. ¶ 24.) Arundel contends that Branch River was aware that "SIP Tape" had not been delivered with the panels. (Opp. S.M.F. ¶ 25.)

3

sales manager visited the jobsite to guide Peachey Builders in the installation of the panels. (Defs.' Addt'l S.M.F. ¶ 36; Opp. Defs.' Addt'l S.M.F. ¶ 36.)

The contract between Arundel and Peachey Builders did not require R-Control SIP panels, but specified that the SIPs used in constructing the roof and the walls of the Facility should have "built-in airflow channels." (Supp. S.M.F ¶ 26; Opp. S.M.F ¶ 27.) Branch River provided vented "Air-Flo" SIPs for the roof. (Supp. S.M.F ¶ 27.) However, these panels were not licensed "R-Control" SIPs as Arundel had supposedly expected and as Branch River allegedly represented.[9] (Opp. S.M.F. ¶ 27.) After the installation of the SIPs provided by Branch River, Dan Patry designated his son, Chris Patry, a civil engineer, to assist in the project. (Supp. S.M.F ¶ 29; Opp. S.M.F ¶ 29.)

Upon speaking with a representative of R-Control, Chris Patry learned that the installed SIPs were not R-Control Air-Flo SIPs.[10] (Opp. S.M.F. ¶ 34.) Thereafter he contacted Branch River to request proof that the installed SIPs met the structural load capacity required by the town's Building Code. (Supp. S.M.F. ¶ 34) That contact appears to have been the first direct contact between Arundel and Branch River—Dan Patry and Chris Patry admitted not having known that Branch River was the manufacturer of the SIPs provided to the project until after the SIPS had been purchased and installed. (S.M.F. ¶¶ 28-30)

Branch River contends that while R-Control SIPs were not provided to the Plaintiff, the Plaintiff was provided with "Air-Flo SIPs." Branch River avers that there is no crucial

---

[9] Arundel contends that the SIPs received were non-R-Control and therefore were not *per se* code compliant. Arundel contends that Branch River is not a manufacturer of R-Control products as they represented because they do not have a quality control manager. Such manager is alleged to be required in order for Branch River to maintain its R-Control license. (Pls.' Opp. Mot. 3.)

[10] On May 30, 2012, Chris Patry contacted Kel House to inquire about the factory warranty on what he thought to be R-control SIPs. (Supp. S.M.F. ¶ 31; Opp. S.M.F ¶ 31.) Chris Patry was concerned that the absence of SIP tape may void the warranty. House then contacted Bob Mayo, the President of Branch River, to as whether the warranty on the panels would still be honored. (Supp. S.M.F. ¶ 31) Branch River agreed to maintain the warranty notwithstanding the absence of SIP tape. (Supp. S.M.F. ¶ 32; Opp. S.M.F ¶ 32.)

4

difference between the two and they are manufactured by using exactly the same process. Branch River further insists that the only difference between the two is that Air-Flo SIPs have vents cut into one side of the polystyrene core. (Opp. Defs.' Addt'l S.M.F. ¶ 17.)

However, James Nagle, the Code Enforcement Officer for the Town of Arundel issued a verbal stop-work order to Peachey Builders and Arundel. (Supp. Addt'l S.M.F. ¶ 7; Opp. Defs.' S.M.F. ¶ 27.) The parties dispute the circumstances under which Mr. Nagle issued the stop-work order. However, the undisputed facts indicate that he directed that work stop until the load capacity of the installed SIPs could be determined. (Opp. Defs.' Addt'l S.M.F. ¶ 27.)

Robert Mayo, the president of Branch River, arranged to have sample Branch River SIPs tested for load bearing capacity, to demonstrate that the panels were in compliance with the Building Code. (Supp. S.M.F. ¶¶ 35, 36.) However, Arundel contests the validity of the test, as the panels tested were not the panels actually installed. (Opp. Defs.' Addt'l S.M.F. ¶ 35.) Chris Patry contacted Kevin Chamberlain, a registered professional engineer, who determined that there was a number of installation and manufacturing deficiencies in the Branch River SIPs as installed which could diminish the useful life of the roof. (Supp. S.M.F. ¶ 40; Opp. S.M.F ¶ 40.) As a result of this finding, Dan Patry had the roof removed from the Facility and replaced with a roof constructed of SIPs manufactured by Foard Panel. (Supp. S.M.F. ¶ 47; Opp. S.M.F. ¶ 47.)

### III. STANDARD OF REVIEW

To survive a motion for summary judgment on a claim, "the [party asserting the claim] must establish a prima facie case for each element of [its] cause of action." *Bonin v. Crepeau*, 2005 ME 59, ¶ 8, 873 A.2d 346. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). A "material fact" is one that can affect the outcome of the case, and a

5

genuine issue exists when there is sufficient evidence for a fact finder to choose between competing versions of the fact. *See Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774. Although parties may differ as to the legal conclusions to be drawn from the record, summary judgment is proper where the facts are not in dispute. *See S.D. Warren Co. v. Town of Standish*, 1998 ME 66, ¶ 9, 708 A.2d 1019. The court views the evidence in the light most favorable to the non-moving party. *Webb v. Haas*, 1999 ME 74, ¶ 18, 728 A.2d 1261.

## IV. DEFENDANTS' MOTION

The Motion for Summary Judgment of Defendants Branch River and Robert Mayo seeks summary judgment on all of the seven counts of the Plaintiffs' Complaint that pertain to Branch River and Mr. Mayo. The moving Defendants contend that the claims contained in Counts V through VIII (negligence, tortious interference, negligent misrepresentation, and intentional misrepresentation) of the Plaintiffs' Complaint are barred by the economic loss doctrine. They contend that Count X (unjust enrichment) is barred by the availability of legal remedies, and that Counts XI and XII (breach of warranties of merchantability and fitness for particular purpose) are barred because the Plaintiffs failed to meet conditions necessary to trigger Branch River's liability on its warranty for the panels.

Defendants further contend that notwithstanding the economic loss doctrine, the Plaintiffs' tort claims fail because Plaintiffs' have not made a *prima facie* showing that either Defendant is liable for any of the tort claims asserted. (Defs.' Supp. Mot. 1, 7) (citing *Davis v. R.C. Sons Pavin, Inc.* 26 A.3d 787, 790 (Me. 2011)). Specifically, the Defendants contend that relief is provided for tortious interference of contract "wherever a person, by means of fraud or intimidation, procures, either the breach of a contract or the discharge of a plaintiff, from an employment, which but for such wrongful interference would have continued." *MacKerron v. Madura*, 445 A.2d 680, 683 (Me. 1982) (citing *Perkins v. Pendleton*, 90 Me. 166, 176, 38 A.96, 99

6

(1897). The Defendants argue there is no factual basis for claiming that plaintiffs were forced to breach a contract as a result of fraud or intimidation by Branch River. (Defs.' Supp. Mot. 8.) Defendants also contend that Plaintiffs fail to meet the elements of both negligent and intentional misrepresentation as well as an equitable claim for unjust enrichment. Defendants aver that there is no basis for the Plaintiffs' claim against Robert Mayo personally as Plaintiffs cannot identify facts sufficient to state a plausible basis for imposing personal liability on Robert Mayo for damages associated with deficiencies in products manufactured and sold by the corporation. The court analyzes these arguments below.

Defendants also challenge the Plaintiffs' removal of Branch River's SIPs as being unnecessary and unjustified. They point out that the DeStefano & Chamberlain report recommended that the roof be repaired due to serious installation errors, not because of any product defect. (Defs.' Supp. Mot. 11.) The Defendants contend that the Plaintiffs lack evidence to prove that their decision to remove the roof was reasonable or necessary because of a product defect. (Defs.' Supp. Mot. 12.)

The Defendants next argue that Kate's is an improper party to this action, because Kate's is not the owner of the subject Facility and did not enter into a contractual relationship with the Defendants.

Branch River further argues that its warranty obligations are controlled by its 20-year factory warranty ["Warranty"]. Branch River contends that it sold the SIPs to House & Sun pursuant to a purchase order which provided that the standard Warranty applied. (Defs.' Supp. Mot. 9.) Said Warranty expressly warrants that the SIPs "will be free from defects in materials and workmanship on the date of final delivery to the Owner or Owner's representative." *Id.* However, Branch River asserts that said its liability on its Warranty was subject to conditions

7

that the Plaintiffs failed to fulfill.[11] Branch River argues that the Plaintiffs failed to have sampling and testing conducted in accordance with specified ASTM Test methods. Further, the Warranty was conditioned upon installation of the SIPs in strict accordance with SIP specifications and guidelines in effect at the time of installation.[12]

The Defendants contend they are entitled to summary judgment on the warranty claims asserted in Counts XI and XII of the Plaintiffs' Complaint "because the express condition pursuant to which Mayo agreed to maintain the Warranty was not fulfilled and because no approved testing was conducted by or at the behest of plaintiffs to demonstrate that the panels did not meet warranty value." (Defs.' Supp. Mot. 10.) Thus, if the Plaintiffs are permitted to proceed with their warranty claims, Branch River argues that its liability should be limited only to the original purchase price of the SIPs.

## V. DISCUSSION

### *Economic Loss Doctrine*

The Maine Law Court unequivocally adopted the economic loss doctrine in the matter *Oceanside at Pine Point Condominium Owners Assn. v. Peachtree Doors*, 659 A.2d 267 (Me. 1995). In *Peachtree*, the Law Court defined economic loss as "damages for inadequate value, costs of repair and replacement of defective product, or consequent loss of profits —without claim of personal injury or damage to other property." *Id.* at 270 n.4 (quoting *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 449 (Ill. 1982)). Thus, absent evidence of personal injury or property damage, "[c]ourts generally . . . do not permit tort recovery for a defective product's

---

[11] The warranty language indicated that if the SIPS failed to meet Warranty value after sampling and testing, Branch River would deliver replacement SIPs or a refund of the original purchase. However, the values of the refund shall not exceed the original purchase price of the SIPs. (Defs.' Supp. Mot. 10.)

[12] In this case, while the Plaintiffs failed to utilize SIP tape in the installation of the roof, Mayo agreed that an alternative sealing procedure could be utilized to maintain the warranty. (Defs.' Supp. Mot. 10.)

damage to itself." *Id.* at 273; *see also In re Hannaford Bros. Co. Customer Data Security Breach Litig.,* 613 F. Supp. 2d 108, 127 (D. Me. 2009).

The Law Court in *Peachtree* further determined "[d]amage to a product itself . . . means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" *Peachtree,* 659 A.2d at 270. The doctrine requires courts to "distinguish between a situation where the injury suffered is merely the 'failure of the product to function properly . . . [and] those situations, traditionally within the purview of tort, where the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property.'" *Fireman's Fund Ins. Co. v. Childs,* 52 F. Supp. 2d 139, 142 (D. Me. 1999) (applying Maine law) (*citing East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 868 (1986)).

The applicability of the economic loss doctrine is examined in the context of the particular tort claims asserted by the Plaintiffs.

### *Plaintiffs' Negligence Claim*

In Count V of Plaintiffs' Complaint, Plaintiffs allege the Defendants were negligent in supplying the appropriate R-Control Air-Flo SIPs. The Plaintiffs contend that Defendant Branch River held itself out as capable of producing R-Control Air-Flo SIPS and subsequently breached any duty owed by failing to provide the appropriate SIPs.[13] (Pls.' Compl. ¶¶ 126-27.) Branch River contends that Plaintiffs' negligence claim is barred by the economic loss doctrine

---

[13] "Negligent act" has been defined by the Maine Law Court as:

> [A] violation of the duty to use reasonable care toward another. . . . To sustain a cause of action in negligence, the plaintiff must prove (1) that the defendant owed plaintiff a duty of care, (2) that the defendant breached that duty, and (3) that the breach was an actual and legal cause of the injury suffered by the plaintiff.

*Aliberti, LaRochelle & Hodson Eng'g Corp. v. F.D.I.C.,* 844 F. Supp. 832, 844 (D. Me. 1994) (citing *Wing v. Morse,* 300 A.2dd 491, 495-96 (Me. 1973); *Parker v. Harriman,* 516 A.2d 549, 550 (Me. 1986)).

because it is based solely on the assertion that Branch River failed to provide the goods allegedly requested and because Arundel faces only wholly economic damages.

A decade ago, the Federal District Court for the District of Maine applied the economic loss doctrine to preclude recovery in tort where parties to commercial contracts sought to recover in both tort and contract. *See Me. Rubber Int'l v. Envtl. Mgmt. Grp., Inc.*, 298 F. Supp. 2d 133, 138 (D. Me. 2004). However, Plaintiffs raise an argument that makes the application of the economic loss doctrine less clear. Plaintiffs contend that no contractual relationship exists between the parties. Rather it was Peachey Builders, Arundel's general contractor, who negotiated with Branch River to obtain the SIPs. To date, the law in Maine is unsettled as to whether the economic loss doctrine will bar a claim in tort when the damage is wholly economic, and when there is no contractual relationship between the parties. *Fireman's Fund*, 52 F. Supp. 2d at 143-44; *Banknorth, N.A. v. BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283 (D. Me. 2005).

A few courts in the United States hold "that since the principle behind the economic loss doctrine is to prevent tort law's unreasonable interference with principles of contract law, the economic loss doctrine does not apply where there is no contractual relationship, and thus no privity between the parties." *Plourde Sand & Gravel v. JGI E., Inc.*, 917 A.2d 1250, 1254 (2007) (citing *Trinity Lutheran v. Dorschner Excavating*, 710 N.W.2d 680, 683 (Wis. 2006); *Indemnity Ins. Co. v. Am. Aviation*, 891 So.2d 532, 534 (Fla. 2004)). However, a majority of jurisdictions that have decided the issue hold that "[p]rivity of contract is not an element of the economic loss doctrine," based on the rationale is that "commercial disputes ought to be resolved according to the principles of commercial law rather than according to tort principles . . . . A disputant should not be permitted to opt out of commercial law by refusing to avail himself of

10

the opportunities which that law gives him." *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 575 (7th Cir. 1990).[14]

The Plaintiffs argue that this court should follow the contractual relationship analysis and decline to apply the economic loss rule because the Plaintiffs are not in privity with the Defendant and therefore cannot recover its economic loss in an action for breach of contract.[15] However, this argument ignores the fact that there was no privity of contract between the plaintiff condominium association and the defendant window manufacturer in *Peachtree*, and the Law Court nonetheless applied the economic loss doctrine to bar the association's tort claims.

Injecting negligence liability into what is fundamentally a breach of warranty case not involving any damage to person or property would be inappropriate, because it would displace predictable contractual and warranty liability defined in the course of the transaction in favor of tort liability determined after the fact. The world of contract depends on large part on predictability of rights and obligations. Clearly, when a product causes personal injury or property damage, the harm can legitimately be viewed as a breach of a societal duty sounding in tort, as well as a breach of contractual and warranty duty, and tort remedies come into play, but when the product simply fails to perform as expected or guaranteed, there is no reason to depart from contractual and warranty remedies. This is essentially the basis for the *Peachtree* decision, and the court is constrained to follow it.

For these reasons, Defendants will be granted summary judgment on Plaintiffs' negligence claim in Count V.

---

[14] *See also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 875 (1986); *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24, 28; *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (1986).

[15] The rationale behind the Plaintiffs' argument is that the Defendant likely knew or should have known the effect of its negligence on the Plaintiff.

## Plaintiffs' Negligent Misrepresentation Claim

In Maine a party will be held liable for negligent misrepresentation "if in the course of his business he supplies false information for the guidance of others in their business transactions, and the other party justifiably relies upon it to his pecuniary detriment." *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992) (citing *Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990)); *see also Restatement (Second) of Torts* § 552.

In this case, the Plaintiffs identify the following bases for their misrepresentation claim: Branch River was aware that the SIPs provided were to be used in the construction of Kate's butter-making Facility. Branch River represented directly to Peachey Builders and other agents of Arundel that the SIPs provided would be R-Control Air-Flo SIPs. (Pls.' Opp. Mot. 10.) Branch River knew or should have known that the SIPs provided were not in fact R-Control Air-Flow SIPs. Because the SIPs were not as allegedly promised, Arundel had to remove the SIPs at great expense.[16] (Pls.' Opp. Mot. 11.)

There is a divide among jurisdictions concerning whether the economic loss doctrine permits recovery for wholly economic losses resulting from negligent misrepresentation on the part of the contracting parties or their agents. *See Gannett v. Pettegrow*, Civ.03-CV-228-B-W, 2005 WL 217036 (D. Me. Jan. 28, 2005) *report and recommendation adopted sub. nom. Gannet v. Pettegrow*, Civ.03-CV-228-B-W, 2005 WL 763276, at *7 (D. Me. Feb. 17, 2005). However, in *Peachtree*, the Law Court applied the economic loss doctrine to negligent misrepresentation claims in products liability cases not involving personal injury or damage to property other than the product itself. *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659

---

[16] Arundel contends that that Branch River represented itself as a seller of R-Control products and understood Arundel's project as requiring R-Control panels. Arundel asserts that Branch River knew or should have known that what they supplied to the project was not in fact R-Control materials.

12

A.2d 267, 273 (Me. 1995) (affirming the trial court's grant of summary judgment on a negligent misrepresentation claim); *see also Maine Rubber*, 298 F. Supp. 2d at 136.

Some exceptions to the rule have been identified in certain limited circumstances in Maine trial court decisions. For example, in *Pendleton Yacht Yard, Inc. v. Smith*, the Superior Court declined to apply the economic loss doctrine to a negligent misrepresentation claim where conduct by the defendant arose outside the scope of the contract. In *Pendleton*, the plaintiff had a contract with Marine Design & Survey, Inc. for an audio-gauging inspection to be completed on a landing craft the plaintiff considered purchasing. 2003 WL 21714927, at *1 (Me. Super. Mar. 24, 2003). The defendant, who was an accredited and certified marine surveyor, performed the requested services under the contract.[17] *Id.* However, it was alleged that the defendant made further observations and rendered opinions as to the condition and value of the boat that induced the plaintiff into purchasing the vessel. The court noted that any conduct by the defendant outside of the scope of the contract "would give rise to an action in tort notwithstanding the economic loss doctrine." *Id.* at 5.

In a Maine Business & Consumer Court case, the court also recognized an exception to the economic loss doctrine. *Camden Nat. Bank v. D & F Properties*, LLC, BCD-WB-RE-10-16 (Bus & Consumer Ct. Oct. 3, 2011, *Nivison J.*). In *Camden*, the Bank funded the defendants/counterclaim plaintiffs' purchase of commercial real estate in Monmouth, Maine where the defendants operated a convenience store and gas station known as the Pit Stop. The defendants relied on the professional expertise of a loan representative on behalf of the Bank. The representative promised that that the defendants would be timely funded by the Bank. In reliance on the representative's statements, the defendants began spending operating capital on

---

[17] The court noted, "[T]he circumstances surrounding the contract may give rise to an independent duty to exercise due care or similar duty in tort, in which case a breach may be actionable under both tort and contract theory." *Pendleton*, 2003 WL 21714927, at *3.

renovations for the Pit Stop. *Id.* at 3. Ultimately, as a result of delay in funding, the defendants defaulted on their loans and had to close the business. The Bank seized the defendants' accounts and instituted foreclosure proceedings. Given this set of facts, the court refused to apply the economic loss doctrine, noting "the doctrine does not apply appl[y] to claims of misrepresentation." *Id.* at 4.

While both of the above mentioned cases hint that there might be an exception to the economic loss doctrine as it applies to claims of misrepresentation, this view has yet to be adopted by the Law Court. As noted above, among the claims that the Law Court held in *Peachey* to be barred by the economic loss doctrine was a claim for negligent misrepresentation.

Further, neither *Pendleton* nor *Camden* involved a product as opposed to a service, and can be distinguished from the facts in *Peachtree* and in this case on that ground alone. As in *Peachtree* and *Maine Rubber*, "the critical issue here . . . is value and quality of what was purchased," and there is no reason not to limit the Plaintiffs to their remedies provided under the product warranties that apply. Thus, the Plaintiffs' negligent misrepresentation claim is barred by the economic loss doctrine. Defendants are entitled to summary judgment on the negligent misrepresentation claim in Count VII of the Complaint.

### *Plaintiffs' Intentional Misrepresentation Claim*

The applicability of the economic loss doctrine to a claim of intentional misrepresentation is an open question under Maine law. *See American Aerial Servs. v. Terex USA, LLC.*, No. 2:12-cv-00361-*GZS* (D. Me. May 7, 2013). In Maine, fraudulent misrepresentation and intentional misrepresentation have been treated as the same tort. *Camden Nat. Bank v. D & F Properties, LLC.*, BCD-WB-RE-10-16 (Bus. & Consumer Ct. Oct. 3, 2011, *Nivison, J.*) (equating intentional misrepresentation and fraud). To prevail on a claim of fraudulent/intentional misrepresentation, the plaintiff must show:

14

(1) that [the Defendant] made a false representation (2) of a material fact[18] (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing plaintiff to act in reliance upon it, and (5) plaintiff[s] justifiably relied upon the representation as true and acted upon it to [their] damage.

*Mariello v. Giguere*, 667 A.2d 588, 590 (Me. 1995) (citing *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992)).[19] In the case at hand, Arundel contends the Defendants misrepresented that the SIPs provided were R-Control SIPs and that said SIPs were *per se* code compliant. Branch River allegedly knew that the SIPs provided were not R-Control as represented and as a result of Plaintiffs' reliance on the misrepresentations the Plaintiffs sustained pecuniary losses.

While the economic loss doctrine typically bars tort claims for wholly economic losses, Maine courts have held that the economic loss rule is inapplicable to fraud claims because in such claims "Plaintiff's injury is sustained at the time he makes the purchase in reliance on Defendant's purposeful misrepresentation." *Everest v. Leviton Mfg. Co.*, 2006 Me. Super. Lexis 12, at *5-*6 (Jan 13, 2006). Further, sister states have also recognized that the economic loss doctrine does not apply in instances where the tort is intentional. *First Choice Armor & Equip., Inc. v. Toyobo Am., Inc.*, 717 F. Supp. 2d 156, 163 (D. Mass. 2010) ("Although the economic loss doctrine bars recovery for pure economic loss in negligence and strict liability cases, it does not apply in instances where the tort is intentional.").

Arundel's fraud claim is based on alleged misrepresentations Branch River made to induce it to buy its products, independent of any breaches of warranty. In essence, the Plaintiffs allege that Branch River intentionally represented its SIPs to be R-Control SIPS when in fact they were not, and that Arundel purchased the SIPs in reliance on that

---

[18] "To be material, the false or fraudulent representation must 'not only influence the buyer's judgment in making the purchase but also must relate to a fact which directly affects the value of the property sold.'" *Mariello*, 667 A.2d at 590 (citing *Bolduc v. Therrien*, 147 Me. 39, 43, 83 A.2d 126, 129 (1951)).

[19] Each of the above elements must be proved by clear and convincing evidence. *Butler v. Poulin*, 500 A.2d 257, 260 n. 5 (Me. 1985).

misrepresentation. Their contention regarding a misrepresentation is supported by statements on the Branch River website. They also contend that a Branch River employee told an employee of House & Sun that Branch River's SIPS would be R-Control. However, the remainder of the allegation—reliance on the alleged misrepresentation—lacks support in the record.

Nothing in any written contract or proposal in the record required Branch River to supply R-Control SIPS. There is no evidence that Branch River or Mr. Mayo represented to Plaintiffs before the purchase that Branch River would be supplying licensed R-Control SIPS to the Facility, or that Plaintiffs sought any assurances to that effect. There is also no evidence that either of the Plaintiffs dealt with Branch River or relied on the Branch River website. Moreover, even assuming, as the court does in taking disputed facts in a light most favorable to the Plaintiffs, that a Branch River employee told a subcontractor that Branch River SIPS would be R-Control SIPS, Branch River's failure to provide what was supposedly promised does not equate to a valid claim of fraud or intentional misrepresentation.

In fact, the Complaint undercuts Arundel's claim by alleging, on information and belief, that the parties that did deal directly with Branch River—Peachey, House and Browne—knew that the SIPS to be provided by Branch River to the Facility were not R-Control SIPS. *See* Complaint ¶¶ 168-71.

Finally, because there is no mention of R-Control being a requirement in any contract or proposal in what appears to have been an extensively documented project, the record evidence suggests that R-Control did not become a concern, much less a requirement, until well after the installation process was underway.

16

Thus, Plaintiffs have not made out a *prima facie* showing of fraud or intentional misrepresentation, much less proffered any clear and convincing evidence of such, on anyone's part, and Defendants are entitled to summary judgment on Count VIII of the Complaint.

*Plaintiffs' Tortious Interference with Contract Claim*

Maine law is silent on whether the economic loss doctrine will bar a claim for tortious interference with contract. However, a majority of states recognize that the economic loss doctrine normally does not bar recovery for tortious interference.[20] In Maine, to establish a claim for tortious interference with contractual relations, a plaintiff must prove the following: "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately cause damages."[21] *Currie v. indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400 (*quoting Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d. 1104). Under Maine law, a tortious interference claim requires either a valid contract or prospective economic advantage. *Id.*

In this case, Plaintiffs had a valid contract with Peachey Builders for the planning and construction of the Facility. The design submittals presented to Arundel under the contract

---

[20] *See generally Bankers Risk Mgmt. Services, Inc. v. Av-Med Managed Care, Inc.*, 697 So. 2d 158, 161 (Fla. Dist. Ct. App. 2d Dist. 1997) ("The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract."); *Reengineering Consultants, Ltd. v. EMC Corp.*, 2009 WL 113058 (S.D. Ohio 2009) (the economic loss doctrine is limited to negligence, and therefore does not apply to intentional interference with contractual relations); *Kayser v. McClary*, 875 F. Supp. 2d 1167, 1176 (D. Idaho 2012) ("[F]irst, a claim for tortious interference with contract is intended to protect a party's economic interest in contractual relations. Accordingly, economic losses *must* be recoverable and it would not be sensible for the tort to be recognized under Idaho law on one hand, and then effectively eviscerated by application of the Economic Loss Doctrine on the other hand.").

[21] "Intimidation is not restricted to frightening a person for coercive purposes, but rather exists wherever a defendant has procured a breach of contract by making it clear to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff."
*Currie*, 2007 ME 12, ¶ 31, 915 A.2d 400 (quoting *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)) (citations omitted).

required that SIPs be used in the construction of the Facility. While Plaintiffs expected the SIPs to be R-Control SIPs, the contract did not specify that R-Control SIPs be used. Plaintiffs contend that in order to save money on the transaction, Branch River knowingly provided SIPs that were not R-Control.[22] However, the Plaintiffs have failed to present evidence that Branch River's failure to provide the expected SIPs interfered with the contract through fraud or intimidation. Because the Plaintiffs have not met the requisite elements necessary to sustain claim for tortious interference with contract, the court will grant summary judgment on this claim.

### Plaintiffs' Unjust Enrichment Claim

"An unjust enrichment claim is brought to recover the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *U.S. Bank, Nat. Ass'n v. Thomes*, 2013 ME 60, ¶ 14, 69 A.3d 411 (citing *Estate of Miller*, 2008 ME 176, ¶ 29, 960 A.2d 1140) (quotation marks omitted); *see also Paffhausen v. Balano*, 1998 ME 47, 708 A.2d 269.

"To pursue unjust enrichment in equity, the plaintiff must lack an adequate remedy at law. A remedy at law is adequate if it '(1) is as complete, practical and as efficient to the ends of justice and its prompt administration as the remedy in equity, and (2) is obtainable as of right.'" *Wahlcometroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 22, 991 A.2d 44, 49. Here, only Arundel, and not Kate's, arguably conferred a benefit on Branch River, but Arundel has an adequate remedy for breach of warranty that, if proved, could compensate Arundel for some or all of what it paid for Branch River's SIPs. The unjust enrichment claim in Count X of the Complaint explicitly

---

[22] Plaintiffs argue that as a direct and proximate consequence of Branch River's interference with Arundel's contract with Peachey Builders, Plaintiffs have been unable to obtain the benefit of the contract.

18

relies on the same set of facts that the Plaintiffs' previously pleaded claims rely upon. Defendants are entitled to summary judgment on Count X of the Complaint.

### *Plaintiffs' Breach of Warranty Claims*

With respect to Plaintiffs' warranty claims in Counts XI and XII of the Complaint, Branch River first argues that when Peachey Builders failed to properly install the SIPs, it offered to maintain the 20 Year Warranty,[23] so long as Peachey Builders undertook special and specific measures outlined by Branch River. These conditions were never met as the roof was ultimately removed. (Defs.' Mot. 10.) However, Branch River contends that if the Warranty is found by this court to apply, then Branch River's "maximum liability for warranty claims shall not exceed the original purchase price of the SIPs."[24]

In response to this cap on damages Arundel argues first that the Warranty document does not apply to Arundel's claim; second the provision in the Warranty does not apply because Arundel is seeking direct damages and not consequential damages; and third, the provision should not apply here as Arundel was allegedly supplied with a product different than what was originally contracted for by its alleged agent Peachey Builders. Arundel further contends that Branch River breached the implied warranty of merchantability and the duty of fitness for a particular purpose.

Arundel has made a *prima facie* showing that Branch River knew for what purpose the SIPS it supplied would be used, and that they were not suitable for that purpose, although Branch River clearly has some responses to Arundel's evidence that the fact finder could find persuasive. It is also not clear on this record that Arundel is limited to an express warranty

---

[23] Branch River contends that generally all SIPs, like the ones installed in the Facility, are subject to Limited 20 Year Warranty that the SIPs are "free from defects in materials and workmanship on the date of final delivery to the Owner or Owner's representative." (Defs.' Mot. 9.)

[24] This limits damages to $111,010, the ultimate cost of the Air-Flo SIPS installed at the Facility.

claim. Even Arundel were so limited, there are issues of fact regarding whether Arundel complied with the conditions set forth in the express warranty. The court also declines Branch River's invitation to rule that Arundel's warranty damages are limited to what is provided in its express warranty. Branch River has multiple defenses to Arundel's warranty claims, but the validity of the claims and defenses are for a fact finder to decide.

Defendant Branch River's Motion for Summary Judgment is denied as to Counts XI and XII of the Complaint.

### *Personal Liability of Robert Mayo*

Although the foregoing rulings grant summary judgment as to all claims against Robert Mayo (the only remaining claims being those against Branch River only, in Counts XI and XII), Defendants have shown an independent ground for granting Mr. Mayo summary judgment. Defendants' Motion argues that the Plaintiffs cannot identify facts sufficient to state a plausible basis for imposing personal liability against Mayo for damages associated with the products manufactured and sold by Branch River. In Maine, there is strong public policy holding corporations as separate legal entities with limited liability. *Johnson v. Exclusive Properties Unlimited,* 1998 ME 244, ¶ 5, 720 A.2d 568. "As such, courts are generally reluctant to disregard the legal entity and will cautiously do so only when necessary to promote justice." *Anderson v. Kennebec River Pulp & Paper Co.,* 433 A.2d 752, 756 n.5 (1981). However, a court will pierce the corporate veil "when equity so demands, and may disregard the corporate entity 'when used to cover fraud or illegality, or to justify a wrong.'" *Id.* (quoting *Me. Aviation Corp. v. Johnson,* 160 Me. 1, 5, 196 A.2d 748, 750 (1964)).

The Law Court has set forth two common elements that Plaintiffs must establish to disregard the legal entity. First, "some manner of dominating, abusing, or misusing the corporate form. *Johnson,* 1998 ME 144, ¶ 6, 720 A.2d 568. Second, there must be an unjust or

20

inequitable result that would arise if the court recognized a separate corporate existence.[25] *Id.* In determining whether a shareholder has abused the privilege of a separate corporate entity the courts will examine a series of factors. For example:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity[,] assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.

*Id.* ¶ 7.

However, piercing the corporate veil is not the only theory for holding corporate employees or agents individually liable to third parties. Corporate officers may be liable for their own tortious conduct and conduct amounting to an unfair trade practice. *See Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 13, 901 A.2d 189; *see also Mariello v. Giguere*, 667 A.2d 588, 590-91 (Me. 1995). Here, Plaintiffs argue that Robert Mayo was personally responsible for the misleading representations on Branch River's website. However, as noted above, the Plaintiffs have not shown evidence that either they or their contractor, architect or roof supplier actually relied on the website. Perhaps the clearest proof of this is the fact that the contract that Arundel chose to enter into with Peachey, the general contractor, did not specify that the SIPS had to be R-Controlled.

Plaintiffs have not made a *prima facie* showing that Robert Mayo can be held personally liable on either of the two bases for imposing such liability. Plaintiffs have not demonstrated a basis on which a fact finder might hold Mr. Mayo personally liable, either on a veil-piercing basis or based on his own tortious acts. He will be granted summary judgment on all claims against him.

---

[25] In establishing this test, the court seeks to balance the policy of encouraging business development with the policy of protecting patrons of the business. *Johnson*, 1998 ME 144, ¶ 6, 720 A.2d 568.

*Plaintiff Kate's Butter as a Proper Plaintiff to this Action*

Branch River contends that Kate's Butter is not a proper party to this suit. In support of this assertion Branch River contends Kate's is not the owner of the Arundel Facility. Rather, Kate's merely leases the Facility from Arundel. Further, Kate's has no contractual relationship with any of the Defendants. In response, Kate claims to have been damaged as a result of Branch River's failure to supply R-Control SIPS. Kate's claim presumably is one for delay damages—clearly a form of consequential damages.

The only remaining claims of those pleaded in the Complaint against Branch River are the claims for breach of warranty in Counts XI and XII. Although breach of warranty claims do not require privity of contract and may be enforceable by the ultimate consumer, the consumer still must be a purchaser of the product. The SIPs are goods, and the Uniform Commercial Code remedies for breach of implied warranty run to buyers. *See* 11 M.R.S. § 2-714, 2-715.

## VI. CONCLUSION

The entry will be: Defendants' Motion for Summary Judgment is GRANTED as to Counts V, VI, VII, VIII and X of the Complaint, and to all counts asserting personal liability against Robert Mayo. Said Motion for Summary Judgment is DENIED as to Branch River with respect to Counts XI and XII.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: November 5, 2014                    s/ A. M. Horton

_____

A.M. Horton, Justice
Business & Consumer Court

Entered on the Docket: 11·6·14
Copies sent via Mail___ Electronically ✓

22

**Arundel Valley, LLC and Kate's Homemade Butter, Inc., Daniel J. Patry and Karen I. Patry v. Peachey Builders, Inc.; Gary R. Peachey; Kevin Brown Architecture, LLC; Kevin Brown; Branch River Plastics, Inc.; Robert Mayo; House & Sun, Inc., and Kel House**

**BCD-CV-13-15**

**Arundel Valley, LLC and Kate's Homemade Butter, Inc.**
**Daniel J. Patry and Karen I. Patry**
  **Plaintiffs / 3rd Party Plaintiffs**

   Counsel:      Timothy Bryant, Esq.
             One City Center
             PO Box 9546
             Portland, ME  04112-9546

**Peachey Builders, Inc. and Gary R. Peachey**
  **Defendant**

   Counsel:      David Ray, Esq.
             100 Middle St
             PO Box 9729
             Portland, ME 04104-5029

**Kevin Brown Architecture, LLC and Kevin Brown**
  **Defendant**

   Counsel:      Rebecca Farnum, Esq.
             Three Canal Plaza
             PO Box 4630
             Portland, ME 04112-4630

**Branch River Plastics, Inc. and Robert Mayo**
  **Defendant**

   Counsel:      Martica Douglas, Esq.
             103 Exchange St.
             PO Box 7108
             Portland, ME 04112-7108

**House & Sun, Inc., and Kel House,**
  **Defendant**

   Counsel:      L. J. Topchick, Esq.
             477 Congress St 5th Floor
             Portland, ME 04101

STATE OF MAINE

Cumberland, ss.

BUSINESS AND CONSUMER COURT

AMH-CUM- 1-14-15

ARUNDEL VALLEY, LLC and
KATE'S HOMEMADE BUTTER, INC.,

Plaintiffs

v.

Docket No. BCD-CV-13-15 ✓

PEACHEY BUILDERS, INC.; GARY R. PEACHEY;
KEVIN BROWN ARCHITECTURE, LLC; KEVIN BROWN;
BRANCH RIVER PLASTICS, INC.; ROBERT MAYO;
HOUSE & SUN, INC., and KEL HOUSE,

Defendants

DANIEL J. PATRY and KAREN I. PATRY,

Third-Party Defendants

## CASE MANAGEMENT SCHEDULING ORDER NO. 3

A status conference was held in this case January 12, 2015, with attorneys Bryant and Piper representing the Plaintiffs; attorney Douglas representing Defendant Branch River Plastics, Inc., and attorney Williams representing Kevin Brown and Kevin Brown Architecture, LLC. As a result, it is ORDERED as follows:

1. **Discovery:** Discovery is complete except with regard to two potential defense witnesses, Larry Turner and Craig Barnes. Branch River's counsel will advise Arundel Valley's counsel by January 20, 2015 whether either witness will be called, whether as a fact witness or expert witness. If either will be called, Arundel Valley may take the depositions upon oral examination of that witness.

2. **Settling Defendants:** The Defendants in this case other than Branch River and Robert Mayo have reached a settlement with the Plaintiffs. Pursuant to 14 M.R.S. § 164, Branch River has elected to have the value of the consideration obtained by Plaintiffs for the settlement deducted from the amount of any judgment rendered against Branch River. Branch River's counsel has been made aware of the terms of the settlements. The settling Defendants will be dismissed from this case on motion,

3. **Motion for Reconsideration:** The Plaintiffs have filed a Motion for Reconsideration of certain rulings in the November 5, 2014 Order on Defendants' Motion

1

for Summary Judgment. The primary focus of the Motion to Reconsider is Plaintiffs' negligent misrepresentation claim.

Plaintiffs point out that the negligent misrepresentation on which they rely predates the actual purchase of the product here, and that the misrepresentation goes to the very nature of the product, not merely to the quality of the product. Those are distinctions without a difference. In essence, the principle underlying the economic loss doctrine is that when the claim is that a product is not as promised or warranted, and when there is no personal injury or property damages, the plaintiff's remedy lies in the sphere of contract and warranty, not in tort recovery. Here, the essential claim is that Branch River sold a product that was not what Branch River represented it to be, and that therefore was not suitable for Plaintiff Arundel Valley's purposes and had to be removed. Thus, the claim presents a classic breach of express and/or implied warranty of fitness for particular purpose. The court remains persuaded that the Law Court's decision in *Oceanside at Pine Point Condominium Owners Assn. v. Peachtree Doors*, 659 A.2d 267 (Me. 1995) precludes a negligent misrepresentation claim in an action for a defective or improper product, not involving personal injury or damage to other property.

That said, the Plaintiffs may still be able to present the same evidence on the remaining warranty claims that they would have presented on a negligent misrepresentation claim in terms of both liability and damages. Those issues have yet to be determined. Plaintiffs' other contentions in their Motion to Reconsider do not require discussion here.

Plaintiffs' Motion for Reconsideration is denied.

**4. Judicially Assisted Settlement Conference:** As the initial Case Management Scheduling Order indicated might occur, the court is scheduling a judicially assisted settlement conference before another judge. Unless specifically excused from attending in advance by the presiding judge, at least one officer of each Plaintiff and of Branch River are hereby ordered attend throughout, in person, and an adjuster for any insurer who might be liable to indemnify Branch River will also attend in person unless excused in advance. The Judicial Scheduling Secretary will contact counsel regarding dates for the conference.

**5. Trial Venue and Dates:** The parties have agreed to a transfer of venue to Cumberland County for purposes of jury trial, in light of the likely delay associated with scheduling a jury trial in York County. *See* BCD Standing Order On Transfer of Venue. *http://www.courts.maine.gov/rules_adminorders/adminorders/so_JB-07-1.html* Trial is hereby scheduled as follows: Jury selection with trial to follow immediately at **8:30 a.m., Monday, June 22, 2015 at the Cumberland County Court House.** The court is allocating five days for trial.

**6. Conference of Parties and Joint Final Pretrial Statement:** On or before **June 17, 2015,** the parties shall file a Joint Final Pretrial Statement, based on a conference between the parties, which shall comply in all respects with M.R. Civ. P. 135. Counsel for the Plaintiff shall have primary responsibility for coordinating the conference and filing the Joint Final Pretrial Statement and related material. If counsel for the Plaintiff is unable timely to comply with this requirement, counsel shall notify the court in writing of the reasons therefor and request a status conference.

2

7. **Exchange of Witness and Exhibit Lists.**

(a) At or before the conference of the parties, the parties shall meet to mark all exhibits to be offered at trial, and to attempt to stipulate to the authenticity of exhibits without waiving objections to their admissibility at trial, and shall inspect and attempt to agree to all exhibits to be used as demonstrative or visual aids.

(b) The parties shall each submit a list of witnesses and exhibits with the Joint Final Pretrial Statement.   Exhibits not pre-marked and included on the exhibit list are subject to exclusion upon objection or the court's own motion.

8. **Pretrial Conference:**   The pretrial conference will be held at **1 p.m. Thursday, June 18, 2015 at the Cumberland County Court House.**  At the pretrial conference, all parties must be prepared and authorized to discuss the matters identified in M.R. Civ. P. 136 and in the Joint Final Pretrial Statement.

9. **Previous Orders:**   Except to the extent inconsistent with this Order, the previous Case Management Scheduling Orders in this case remain in effect.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Dated January 13, 2015

_____
A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 1-14-15
Copies sent via Mail ___ Electronically ✓

3

**Arundel Valley, LLC and Kate's Homemade Butter, Inc., Daniel J. Patry and Karen I. Patry v. Peachey Builders, Inc.; Gary R. Peachey; Kevin Brown Architecture, LLC; Kevin Brown; Branch River Plastics, Inc.; Robert Mayo; House & Sun, Inc., and Kel House**

**BCD-CV-13-15**

**Arundel Valley, LLC and Kate's Homemade Butter, Inc.**
**Daniel J. Patry and Karen I. Patry**
**    Plaintiffs / 3rd Party Plaintiffs**

    Counsel:                             Timothy Bryant, Esq.
                                          One City Center
                                        PO Box 9546
                                        Portland, ME 04112-9546

**Peachey Builders, Inc. and Gary R. Peachey**
**    Defendant**

    Counsel:                             David Ray, Esq.
                                          100 Middle St
                                        PO Box 9729
                                        Portland, ME 04104-5029

**Kevin Brown Architecture, LLC and Kevin Brown**
**    Defendant**

    Counsel:                             Rebecca Farnum, Esq.
                                          Three Canal Plaza
                                        PO Box 4630
                                        Portland, ME 04112-4630

**Branch River Plastics, Inc. and Robert Mayo**
**    Defendant**

    Counsel:                             Martica Douglas, Esq.
                                          103 Exchange St.
                                        PO Box 7108
                                        Portland, ME 04112-7108

**House & Sun, Inc., and Kel House,**
**    Defendant**

    Counsel:                             L. J. Topchick, Esq.
                                          477 Congress St 5th Floor
                                        Portland, ME 04101